Justice Guzman delivered the opinion of the Court.
Grandparents have a special role in the family unit and often serve as safety nets for their children and grandchildren. Lending a hand, a heart, and an ear can be especially important when loved ones are experiencing the trauma of divorce.[1] But being there in times of need sometimes ensnares grandparents in bitter divorce disputes. In this tragic case, the grandparents' adult daughter employed egregious and outrageous tactics to prevent her ex-husband from seeing their two small children, including coaching their three-year-old son to falsely accuse his father of sexual abuse. While the abuse allegations were under investigation, the grandparents supported their daughter emotionally and as a single mother, helping her care for their grandchildren. Seventeen months elapsed before the allegations were fully investigated and the charges declared unfounded, and soon after, the children's mother traded her parental rights to escape incarceration for contempt of court.
While these events were unfolding, the father sued the grandparents, but not the mother, for negligence, defamation, and *297 "aiding and assisting" their daughter's interference with his possessory rights in violation of Chapter 42 of the Texas Family Code.[2] Following a bench trial, the trial court awarded more than $10.5 million in damages against the grandparents. The court of appeals reversed as to defamation and a small portion of the Family Code damages award but otherwise affirmed the trial court's judgment.[3] We affirm the court of appeals' defamation judgment because the claims were either not pleaded or not supported by sufficient evidence, and we reverse as to the remaining claims and render judgment in the grandparents' favor because the record bears no evidence of a Chapter 42 violation or proximate causation.
I. Background
Larry and Mary Bos (Grandfather and Grandmother, respectively, and collectively, Grandparents) adopted Trisha Bos-Smith (Mother) from a Korean orphanage when she was a toddler. In 2004, Mother married Craig Smith (Father) and in short order they were blessed with two sons: Mike in June 2005 and Charlie in January 2007.[4] Father's twin daughters from a previous marriage lived with the couple and were around six years old when Mike was born. Mother and Father separated in 2006 when Mother (unbeknownst to Father) was pregnant with Charlie. They divorced in April 2007, when both boys were younger than three years old. Mother was awarded primary custody, with Father having visitation rights as agreed between them until each child attained age three. After the age of three, visitation was to follow the standard possession order.[5]
Mother was stingy with her assent to visitation, allowing Father to see the boys on only a handful of occasions in the year following the divorce. After Mike turned three in June 2008, Father asserted his rights to visitation under the standard possession order, but Mother remained uncooperative. Father asked Grandmother to encourage Mother to cooperate with Father and permit visitation. They had many conversations on the topic, but one in particular provides the genesis of this dispute.
On Tuesday, October 13, 2008, Father called Grandmother and told her he had the right to possess Mike under the standard possession order for the upcoming weekend and would be collecting him from Mother's house at 6:00 p.m. on Friday evening.[6] Father arrived at the appointed time, but the boys were not home because, at Mother's request, Grandmother had taken them to a two-hour birthday party. Mother said she had forgotten about the party. After learning the boys were with Grandmother, Father left. He did not contact Grandmother to locate Mike, nor did he attempt to exercise visitation after the party ended.
The next morning, however, Mother unexpectedly brought both boys to Father's home. The visit lasted a mere two hours. During the visit, Mother called Mike on the phone and, shortly after speaking with him, called 911 to make the first of what would eventually prove to be several false sexual-abuse allegations. According to *298 Mother, Mike reported that, during this brief visit, Father's legal assistant, who was working that morning at Father's house, had touched Mike's penis. The police and the Department of Family and Protective Services (DFPS) promptly initiated an investigation, and Mother and Grandmother arrived at Father's house soon after to observe the situation from across the street.
After about two hours, police asked Grandmother to leave, and she took Charlie with her. DFPS required Mike to go to the hospital for a sexual-assault examination, which produced no evidence of sexual abuse. After leaving the hospital with Mike, Mother took him to her parents' house. Mother asked Grandparents to take care of both boys temporarily because the police had advised her not to have contact with them pending an interview with DFPS investigators the following week. Grandparents agreed.
Five days later, Grandparents, Father, Mother, and Mike met with DFPS for a series of interviews. Father learned that Mother was now claiming Father was the actual perpetrator and that she had misunderstood Mike's outcry. Father vehemently denied the allegation. DFPS opened a new investigation and said the boys would be placed in foster care unless Grandparents agreed to monitor Mother's contact with Mike as part of a safety plan. Grandparents agreed, as did Father, and the safety plan was in effect for about six weeks. During this time, Grandparents stayed at Mother's house to supervise her contact with Mike, and Father did not attempt to exercise visitation with either child.
Grandparents quickly found their monitoring duties burdensome, and Grandfather began pressuring DFPS for a resolution. At one point, at his wit's end with the situation, Grandfather told DFPS that (1) Mother was a "perfect" mother; (2) Father was a nut with poor parenting skills; and (3) Father used to abuse his daughters and would brainwash them. Several years later, Grandfather clarified that he had said these things in a desperate attempt to facilitate termination of the monitoring obligation and that Father was actually a "stand up guy."
Amid the ongoing sexual-abuse investigation, Mother began dating Marlon Bruno, a doctor of psychology and DFPS consultant. Bruno quickly became deeply involved in the boys' lives, allowing them to call him "dad" a mere two months into the relationship. Acting in a pseudo-parental role, Bruno supported Mother's efforts to keep the boys from Father as Mike continued to make outcries of sexual abuse by his father and eventually one or both of his twin half-sisters. Bruno reported many of Mike's outcries, took the boys to multiple sexual-assault examinations, and signed hospital paperwork as their parent. As Bruno's involvement with the boys increased, Grandparents' participation declined, partly because Mother did not need them to care for the boys as much and partly because Grandmother suffered a series of health crises that resulted in her extended hospitalization.
DFPS and the police extensively investigated the sexual-abuse allegations, and about a year into the saga, police referred the case against Father to the district attorney. This action lead to a grand-jury investigation, but DFPS ultimately ruled out all sexual-abuse allegations, and no charges were ever filed against Father or anyone else.
At a hearing before the divorce judge, the court held Mother in contempt and imposed jail time for violating the standard possession order. Minutes later, in a frantic attempt to avoid confinement, Mother volunteered to relinquish her parental *299 rights. After staying the jail order to allow Mother time to reconsider, the court ultimately terminated Mother's parental rights.
Father, individually and on behalf of his twins and the boys, sued Grandparents asserting they (1) violated Family Code Chapter 42 by assisting Mother's violation of his rights under the standard possession order, (2) breached ordinary-care and fiduciary duties they owed to the boys, and (3) defamed Father and the twins based on Grandfather's statements to DFPS. Father also sued Bruno, asserting a host of claims, including conspiracy, defamation, and intentional infliction of emotional distress. Although Father did not sue Mother, Grandparents designated her as a responsible third party.[7]
After a bench trial, the court entered findings of fact and conclusions of law. The court specifically found that Mother had coached Mike to make the outcries and neither Father nor the twins sexually assaulted Mike. No one disputes these findings. All parties agree the children were not sexually abused. The court awarded (1) Father $3.2 million in economic and mental-anguish damages on his Chapter 42 claim, (2) the boys $4 million on the negligence and breach-of-fiduciary-duty claims, (3) the twins $1.5 million for defamation, and (4) Father $2 million for defamation. The court held Grandparents and Bruno jointly and severally liable for all damages.[8] Grandparents appealed, but Bruno did not.[9]
The court of appeals affirmed as to the Family Code, negligence, and fiduciary-duty claims but reversed on the defamation claims and suggested a remittitur of a small portion of the Family Code damages, which Father accepted.[10] In cross-petitions for review, all parties challenge the appellate court's judgment, disputing whether (1) legally sufficient evidence supports Grandparents' liability under Chapter 42, (2) Grandparents breached duties that proximately caused the boys' injuries, (3) the defamation claims were properly pleaded, and (4) legally sufficient evidence of proximate cause supports the defamation damages awarded.
II. Discussion
A. Standard of Review
We review a trial court's legal conclusions de novo but defer to the trial court's fact findings if they are supported by legally sufficient evidence.[11] An erroneous conclusion of law does not require reversal if the trial court rendered the proper judgment.[12]
Evidence is legally insufficient to support a disputed fact finding when (1) evidence of a vital fact is absent, (2) rules of law or evidence bar us from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered *300 to prove a vital fact is no more than a mere scintilla, or (4) the evidence conclusively establishes the opposite of the vital fact.[13] We view the evidence in the light most favorable to the fact finding, indulging every reasonable inference that would support it and disregarding contrary evidence unless a reasonable factfinder could not.[14]
B. Family Code Chapter 42
Section 42.002 of the Family Code authorizes a civil action against a person "who takes or retains possession of a child or who conceals the whereabouts of a child in violation of a possessory right of another person."[15] A possessory right is "a court-ordered right to possession of or access to a child, including conservatorship, custody, and visitation."[16] The standard possession order granting Father visitation with Mike beginning in June 2008 gave Father possessory rights under the Family Code, and no one disputes that Mother retained possession of Mike in violation of Father's right of possession for some periods in 2008 and 2009. The focus here, however, is not on Mother's flagrant violations but whether Grandparents, under the peculiar and outlandish facts present here, are liable under Family Code Section 42.003 for "assis[ting]" her in doing so.
Section 42.003 imposes civil liability for assisting interference with a possessory right: "A person who aids or assists in conduct for which a cause of action is authorized by this chapter is jointly and severally liable for damages."[17] When the alleged assister is not a party to the suit generating the possession order, the person is not liable unless, at the time of the violation, the person "had actual notice of the existence and contents of the order" or "had reasonable cause to believe that the child was the subject of an order and that the person's actions were likely to violate the order."[18]
Father alleges Grandparents violated Section 42.003 by aiding or assisting Mother in violating his right to possess Mike under the standard possession order. Grandparents contend Section 42.003 applies only in child-abduction cases and that their actions do not constitute assistance under Chapter 42. We need not decide whether Chapter 42 applies in non-abduction cases because we conclude the evidence is legally insufficient to establish a violation even if the statute is not limited to abductions.
Liability under Family Code Chapter 42 can arise in two ways: interfering with a possessory right and aiding the one who interferes with a possessory right.[19] Liability for the latter is necessarily derivative of the former. Thus, even though Father did not sue Mother, he nevertheless had to prove she interfered with his possessory rights to sustain a claim that Grandparents assisted Mother's interference.[20]
Father has focused much attention throughout this litigation on Mother's seventeen-month *301 machination to deny him possession. But Chapter 42 does not cover mere schemes. Section 42.003 allows liability for assisting "in conduct for which a cause of action is authorized by this chapter,"[21] and a cause of action is authorized for actually "tak[ing] or retain[ing]" possession of a child or "conceal[ing]" the child's whereabouts,[22] not for planning to do so. Under the standard possession order, Father was entitled to possession in specified circumstances. Thus, Father had to prove he was denied possession during those specific times and that Grandparents aided those particular violations.
Grandparents testified they never received a copy of the standard possession order, and Father adduced no evidence to the contrary. Both Grandmother and Grandfather testified they were generally aware of a custody order and that Father was entitled to some periods of possession but they did not know the details.[23] Because they had no knowledge of the order's contents, Father was required to produce evidence that, at the time of the violation, Grandparents had reasonable cause to believe their actions would likely violate an order.[24]
The trial court found Grandparents aided only one specific violation of the standard possession order-the two-hour birthday-party weekend. Everyone agrees Father was entitled to possession starting at 6:00 p.m. on Friday and that Mother violated the standard possession order by not producing Mike at the appointed time. But the evidence is legally insufficient to show Grandparents assisted this violation. There is no evidence Grandparents knew Mother was planning to deny Father possession. The record shows that after Father spoke to Grandmother earlier in the week and told her he would pick up Mike at 6:00 p.m. Friday evening to exercise his weekend possession, Mother asked Grandmother to take the boys to a birthday party she said she had forgotten about. Nothing indicates Grandmother had reason to attribute a sinister motive to this request as opposed to a minor adjustment of custody times that happens routinely in divorced families. Though Father testified he frequently communicated with Grandmother about securing visitation, Father did not contact Grandmother to inquire about Mike's whereabouts, ask that he be produced at the appointed time, or request his return after the party. No evidence supports the conclusion that, given these circumstances, Grandmother would have a reasonable belief that taking the boys to a birthday party for two hours, at Mother's request, would constitute a violation of any court order.
Nor is there any evidence Grandparents assisted any violation as to the remainder of this weekend. The morning after the party, Mother unexpectedly dropped the boys off with Father, but within two hours, she had called 911 to make the first false sexual-abuse allegation. The police and DFPS began investigating, and Mike was taken to the hospital for a sexual-assault examination. Afterward, Mother took Mike to her parents' house and asked them to keep the boys until a DFPS interview the following week, stating the authorities had advised her not to have contact with the boys until the interview to avoid any accusations of brainwashing. Given these circumstances, *302 Grandparents would not have reasonable cause to believe that keeping the boys, rather than immediately sending them back to the house in which Mike had allegedly been sexually abused only hours before, would constitute a violation of a court order.
Rather than identifying any other specific instance that Mother violated Father's possessory rights as a predicate to analyzing whether Grandparents aided those violations, the trial court based Grandparents' liability only on the two-hour birthday-party-weekend violation and from that concluded Grandparents' participation in that violation "snowballed into the catastrophe" underlying this litigation. This was error. Even if the evidence was sufficient to hold Grandparents liable for that single violation, it would not give rise to perpetual liability for all Mother's future violations. Each violation of court-ordered period of possession must be proven separately and specifically.[25]
The trial court's findings included vague language about Grandparents assisting on other "important dates" but provided no detail. This finding is insufficient to support a claim for assisting interference with a possessory right because it does not identify any such interference and none is apparent from the record.[26] The trial court mentioned a few other dates that Mother denied Father possession, though it never explicitly found Grandparents assisted these violations. Assuming the trial court's other "important dates" language was meant to refer to these dates, the evidence is legally insufficient that Grandparents assisted these violations. The trial court found Father was denied possession during the operation of the safety plan, but Father consented to the plan, which DFPS required Grandparents to sign to prevent the children from going to foster care. In these circumstances, Grandparents would not have reasonable cause to believe supervising the children would violate a court order. The trial court found that Mother and Bruno specifically prevented Father's possession in March and December of 2009, but no evidence exists that Grandparents were involved in or even knew about these incidents. Indeed, it is undisputed that Grandmother was hospitalized in late 2008 and then again for several months in early 2009, during which she and Grandfather did not care for the boys at all.
Father points to evidence he claims shows assistance, including frequent telephone calls between Mother and Grandmother; Grandparents' failure to tell DFPS material information about Mother; Grandfather misleading DFPS about the relative parenting abilities of Father and Mother; and Grandparents watching the boys when Mother worked the weekend graveyard shift. But none of this evidence is linked to a finding of a specific time that Mother violated Father's possessory rights; accordingly, Grandparents cannot be liable under Section 42.003 based on this evidence.
*303 C. Breach of Fiduciary Duty and Negligence
The trial court determined that "[Mother]'s conduct ... is the primary and root cause of the damages" in this case, but that Grandparents owed the boys ordinary-care and fiduciary duties to protect them from their mother, which they failed to fulfill. We need not consider whether Grandparents owed the children a duty because we conclude Mother's conduct was so outrageous and unprecedented that Grandparents could not have reasonably anticipated Mother would behave as she did. Because Mother's conduct was unforeseeable, the boys' fiduciary duty and negligence claims fail as a matter of law.[27]
Claims based on ordinary negligence and fiduciary duty both require showing damages were proximately caused by breach of a duty.[28] Proximate cause has two components: foreseeability and cause in fact.[29] Harm is foreseeable if a person of ordinary intelligence should have anticipated the danger created by an act or omission.[30] "Foreseeability usually is determined by whether the defendant is aware of prior, similar conduct by third parties."[31] The exact sequence of events need not be foreseeable; rather, the prior conduct must be sufficiently similar to give the defendant notice of the general nature of the danger.[32] We consider not only the foreseeability of the general danger but also whether the injury to the particular plaintiff or one similarly situated could be anticipated.[33] "Foreseeability requires more than someone, viewing the facts in retrospect, theorizing an extraordinary sequence of events whereby the defendant's conduct brings about the injury."[34] On the record in this case, Mother's actions were not foreseeable as a matter of law.
Over the course of more than a year, Mother coached Mike to make numerous false sexual-abuse allegations against his father (and later one or both of his half-sisters). Dr. Ferrell, a neutral court-appointed clinical and forensic psychologist, testified that a child as young as Mike could not absorb a lie and believably repeat it without repetitive coaching. Mike said Mother hurt him, stepping on his toes while forcing him to memorize his lines. The false outcries resulted in multiple physically intrusive and mentally traumatizing sexual-assault examinations for Mike and at least one for Charlie. This was not an unintended consequence-Mother specifically orchestrated two sexual-assault examinations for Mike in one day (with a visit to Father in between) in an effort to frame Father.
*304 Nothing in Mother's past suggested she would act so heinously, particularly towards her children. Father makes much of Dr. Ferrell diagnosing Mother with anxiety, depression, indicators of bipolar disorder, borderline personality disorder, and narcissistic and histrionic behavior. Even so, it is undisputed that Mother had never been diagnosed with any mental illness before then. Foreseeability is based on what is known at the time, not hindsight.[35] Mother received brief in-patient treatment in high school when her school performance declined, and as an adult, she had periodic emotional outbursts and had threatened suicide. But there is no evidence the extent of her psychological issues was then-known or that this worrisome behavior portended that she would harm her children.
Before she married Father, Mother made false allegations against a former boyfriend, resulting in a lawsuit that her parents helped her pay to settle. But no evidence indicates the false allegations were in any way similar to those here or that Grandparents knew any case details, including that false allegations were at issue. Nothing in the record afforded Grandparents notice that Mother would hatch an elaborate scheme of false sexual-abuse allegations against Father or that she would involve others in implementing her plan, much less her own children.
Even if the general nature of Mother's plot was foreseeable, the harm to her children was not.[36] A year earlier, the divorce court, with Father's agreement, awarded Mother primary custody of the boys, providing Grandparents with objective indications that Mother was a fit parent. Grandparents were also aware of Mother's parenting of her other child, Alice, whom she had as a teenager. Grandparents raised Alice, who continued to live with them when Mother moved out at age twenty-five. At one point, Grandparents sought custody of Alice but did not pursue it after Mother refused to consent. The record shows only that Grandparents sought legal custody to facilitate processes such as signing medical and school paperwork rather than any misconduct by Mother. No evidence regarding her parenting of Alice suggests Mother would engage in the physically and emotionally harmful conduct she did here.
Though prior conduct need not be identical to render a specific act foreseeable, it must be sufficiently similar to allow a reasonable person to anticipate and therefore protect against it.[37] So, for example, a scoutmaster's molestation of a boy was foreseeable based on allegations he had behaved inappropriately with other boys,[38] but a husband's sexual assault of his young daughter's friend was unforeseeable to his wife because he had never engaged in any such conduct before.[39] Prior domestic disturbances, *305 vandalism, and theft did not make a violent crime foreseeable,[40] but a "string of assaults and robberies in an apartment complex make the risk of other violent crimes, like murder and rape, foreseeable."[41] The key is whether the behavior at issue is so similar in character and severity to what came before as to be foreseeable,[42] or instead is so "extraordinarily unlike" prior conduct that it could not reasonably have been anticipated.[43]
We conclude Mother's past behavior, though unquestionably troubling, was so materially different in character and severity that Grandparents could not reasonably anticipate she would use and harm her children in the extraordinary manner she did here. Because Mother's conduct was unforeseeable, no evidence supports a finding of proximate cause in this case.
D. Defamation
In an interview with DFPS in October 2008, Grandfather made the following statements: (1) Mother "is a perfect mother," (2) Mike "is 'clever' and could tell someone if [Mother] coached him into saying something," (3) Father "will have plenty of time to 'brainwash' [the twins] before [DFPS is] able to interview them," and (4) Father "used to abuse the girls and he knows nothing about parenting because 'the guy's a nut.' " Based on these statements, the trial court awarded defamation damages to the twins and Father. Neither award can stand because (1) the pleadings do not support the twins' defamation claims and (2) no evidence of causation exists regarding Father's defamation claim.
1. Twins' Defamation Claim
The live petition states: "[Grandfather] defamed Plaintiffs by misrepresenting that [Mother] had superior parenting skills and [Father] was a 'nut' and other untrue and derogatory statements." The trial court rendered judgment for the twins based on its conclusion that Grandfather "alleg[ed] that they were victims of child abuse by [Father] and were subject to brainwashing by [Father]." Grandfather argues the trial court erred because the judgment does not conform to the pleadings.[44] The court of appeals agreed, as do we.
Pleadings must give fair notice of the nature and basic issues so the opposing *306 party can prepare a defense.[45] When, as here, no special exception is made, we liberally construe the pleadings in the pleader's favor.[46] Even so, a liberal construction "does not require a court to read into a petition what is plainly not there."[47]
The live pleading specifically referred to Grandfather's statements regarding Mother's and Father's parenting abilities. It mentions nothing about the twins. Even liberally construing the pleadings, Grandfather did not have fair notice that the twins were accusing of him of defamation based on naming them as victims of abuse and amenable to brainwashing. The twins argue the petition's reference to "Plaintiffs" (as opposed to one plaintiff) and "other untrue and derogatory statements" is sufficiently broad to include the claim as construed by the trial court. We disagree. Though every fact need not be pleaded, we look to what "can reasonably be inferred from what is specifically stated."[48] When a pleader provides both general and specific allegations, the specific controls, and the pleader cannot rely on the general allegations to expand the scope of the claim.[49] The pleaded defamation claim is thus limited to statements regarding Father, not the twins. The trial court's judgment accordingly does not conform to the pleadings and is invalid.[50]
We reject any argument that Grandfather waived this argument by failing to lodge special exceptions. Special exceptions are designed to provide notice of pleading defects and allow the pleader to cure the defect.[51] The petition here was not defective but pleaded a specific theory of defamation. Grandfather was entitled to rely on that pleaded theory and had no reason to specially except.[52]
The twins point to statements relating to them in prior pleadings and hearings as showing Grandfather had notice they were asserting claims against him based on the abuse and brainwashing statements. Assuming their interpretation of those statements is correct, they are irrelevant. Amended pleadings supersede prior pleadings, and any claim not carried forward in an amended pleading is deemed dismissed.[53]
Finally, the twins claim the issue was tried by consent when Grandfather did not object to admission of his full statement to DFPS. Trial by consent can cure lack of pleading,[54] but an issue is not *307 tried by consent merely because evidence regarding it is admitted.[55] "We must examine the record not for evidence of the issue, but rather for evidence of trial of the issue."[56] Grandfather's statements to DFPS were relevant to other issues in the trial, such as negligence and assistance of a Family Code violation. "The doctrine of trial by consent does not apply when the evidence of an unpleaded matter is relevant to the pleaded issues because it would not be calculated to elicit an objection."[57]
2. Father's Defamation Claim
The trial court found for Father as to two categories of statements Grandfather made about him to DFPS: (1) the false allegation that he abused his daughters and intended to brainwash them, and (2) the assertion that, relative to Mother, he had substandard parenting abilities and was "a nut." The appellate court reversed, finding no proximate cause between these statements and Father's injuries. We agree, but for different reasons, at least in part.
In a pretrial hearing, the trial court struck the portion of Father's defamation pleading relating to Grandfather's statements about parenting skills and Father being a nut because they were added after the pleading deadline. A stricken claim is considered unpleaded.[58] The trial court thus erred in awarding Father defamation damages based on these statements.
We now turn to the portion of the trial court's defamation judgment based on statements that Father had abused the twins and would attempt to brainwash them. Actionable defamation requires (1) publication of a false statement of fact to a third party, (2) that was defamatory concerning the plaintiff, (3) with the requisite degree of fault, and (4) that proximately caused damages.[59] We agree with the court of appeals that no evidence exists that Grandfather's statements proximately caused Father's injuries.
As to the cause-in-fact component of proximate cause, a defendant's action is the cause in fact of an injury if it was "a substantial factor in causing the injury and without which the injury would not have occurred."[60] Grandfather's statement to DFPS was but a small part in the plethora of negative accusations against him by Mother and Bruno, most of which concerned false sexual-abuse allegations against his sons. Indeed, as the trial court found, Mother's defamation and wrongful detention of Mike was "the primary and root cause of damages awarded in this judgment." Father linked none of his damages to Grandfather's specific statements, instead focusing on factors such as the potential grand jury indictment and loss of custody of the boys from Mother's and Bruno's false allegations. Based on Father's testimony about what caused his damages and the overwhelming amount of other circumstances impacting Father's *308 reputation and mental state, we conclude Grandfather's statements were not a substantial factor in causing Father's injuries.[61]
III. Conclusion
The defamation claims against Larry Bos are unsustainable due to lack of pleadings and sufficient causation evidence, and the evidence is legally insufficient to support Larry and Mary Bos's liability under Chapter 42 of the Family Code and the tort theories alleged. We therefore affirm the court of appeals' judgment in part, reverse in part, and render a take-nothing judgment.

See Troxel v. Granville , 530 U.S. 57, 64, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000) (plurality) (grandparents frequently play an important role in helping with child-rearing tasks in the increasing number of single-parent households).

Tex. Fam. Code §§ 42.001 -.009.

492 S.W.3d 361, 393-94 (Tex. App.-Corpus Christi-Edinburg 2016).

We refer to the boys by fictitious names to protect their privacy and for enhanced readability. See Tex. Fam. Code § 109.002(d).

Id. §§ 101.029, 153.251(d)-.256, 153.3101-.317.

As Charlie was not yet three years old at the time of the underlying events, Father's visitation with him was by agreement, not court order.

See Tex. Civ. Prac. & Rem. Code § 33.004.

As to the breach-of-duty claims against Grandmother, which the court concluded were nonsegregable and caused the same damages, the court found her 51% responsible, Grandfather 29% responsible, Trisha 10% responsible, and Bruno 10% responsible. On the same claims against Grandfather, the court apportioned responsibility 51% to him, 29% to Grandmother, 10% to Trisha, and 10% to Bruno.

492 S.W.3d 361, 367 n.2 (Tex. App.-Corpus Christi-Edinburg 2016).

Id. at 393-94.

In re M.P.A. , 364 S.W.3d 277, 289 (Tex. 2012) ; Reliance Nat'l Indem. Co. v. Advance'd Temps., Inc. , 227 S.W.3d 46, 50 (Tex. 2007).

See BMC Software Belg., N.V. v. Marchand , 83 S.W.3d 789, 794 (Tex. 2002).

City of Keller v. Wilson , 168 S.W.3d 802, 810 (Tex. 2005).

Id. at 822.

Tex. Fam. Code § 42.002(a).

Id. § 42.001(2).

Id. § 42.003(a).

Id. § 42.003(b).

Id. §§ 42.002-.003.

See Eberle v. Adams , 73 S.W.3d 322, 327 (Tex. App.-Houston [1st Dist.] 2001, pet. denied) (stating that a Section 42.003 violation requires proof that "a person takes or retains possession of a child or conceals the whereabouts of a child in violation of a court order").

Tex. Fam. Code § 42.003(a).

Id. § 42.002(a).

The only exception is Grandmother's awareness that Father claimed he was entitled to possession the weekend of October 16-18, 2008, which is addressed below.

See Tex. Fam. Code § 42.003(b).

Cf. Ex parte Shaklee , 939 S.W.2d 144, 144-45 (Tex. 1997) (holding contempt order involving father's violation of divorce-decree provision regarding providing children access to four-wheeler was void because it did not specify dates of violation and stating contempt order "must clearly state in what respect the court's earlier order has been violated" (internal quotations marks and brackets omitted) ); In re Nesevitch , 93 S.W.3d 510, 513 (Tex. App.-Houston [14th Dist.] 2002, orig. proceeding) (finding contempt order based on failure to pay child support void because it did not specify dates when support unpaid).

Cf. Shaklee , 939 S.W.2d at 144-45 ; Nesevitch , 93 S.W.3d at 513.

Del Lago Partners, Inc. v. Smith , 307 S.W.3d 762, 774 (Tex. 2010) (noting foreseeability analysis for existence of duty and proximate cause are the same).

See Rodriguez-Escobar v. Goss , 392 S.W.3d 109, 113 (Tex. 2013) ; Finger v. Ray , 326 S.W.3d 285, 291 (Tex. App.-Houston [1st Dist.] 2010, no pet.).

Del Lago Partners , 307 S.W.3d at 774.

Stanfield v. Neubaum , 494 S.W.3d 90, 97 (Tex. 2016).

Taylor v. Louis , 349 S.W.3d 729, 737 (Tex. App.-Houston [14th Dist.] 2011, no pet.).

See Walker v. Harris , 924 S.W.2d 375, 377 (Tex. 1996) ; Doe v. Boys Clubs of Greater Dallas, Inc. , 907 S.W.2d 472, 478 (Tex. 1995) ; Genell, Inc. v. Flynn , 163 Tex. 632, 358 S.W.2d 543, 547 (1962).

See Mellon Mtg. Co. v. Holder , 5 S.W.3d 654, 655 (Tex. 1999) (plurality); Nixon v. Mr. Prop. Mgmt. Co. , 690 S.W.2d 546, 551 (Tex. 1985).

Doe , 907 S.W.2d at 478 ; see also Stanfield , 494 S.W.3d at 103 ("[T]he foreseeability analysis requires looking at all the circumstances in existence at the time." (internal quotation marks omitted) ).

See Stanfield , 494 S.W.3d at 103 ; Doe , 907 S.W.2d at 478.

See Mellon , 5 S.W.3d at 657 (explaining the plaintiff's rape "simply was not foreseeable, beyond a remote philosophic sense" because the plaintiff "was not so situated that injury to her might reasonably have been foreseen" despite evidence it was foreseeable that violent crimes would occur in the parking garage due to the defendant's failure to secure it).

See Walker , 924 S.W.2d at 377 ; Doe , 907 S.W.2d at 478 ; Genell , 358 S.W.2d at 547.

See Golden Spread Council, Inc. # 562 of the Boy Scouts of Am. v. Akins , 926 S.W.2d 287, 290-91 (Tex. 1996) ; accord Isbell v. Ryan , 983 S.W.2d 335, 337, 341 (Tex. App.-Houston [14th Dist.] 1998, no pet.).

See Madison v. Williamson , 241 S.W.3d 145, 153 (Tex. App.-Houston [1st Dist.] 2007, pet. denied).

See Walker , 924 S.W.2d at 377-78 ; see also Trammell Crow Cent. Tex., Ltd. v. Gutierrez , 267 S.W.3d 9, 17 (Tex. 2008) (though many prior robberies occurred, including some with a weapon, no evidence that attack involving shooting from long range without making a prior demand, resulting in a murder, was foreseeable); Doe , 907 S.W.2d at 478 (boys club employee's sexual assault was not foreseeable because of prior DWI convictions); Taylor , 349 S.W.3d at 737 (ex-husband's attack on a third party in former marital home not foreseeable to wife, whom he had assaulted three times before, including twice in that house).

Timberwalk Apartments, Partners v. Cain , 972 S.W.2d 749, 758 (Tex. 1998).

See Quiktrip Corp. v. Goodwin , 449 S.W.3d 665, 670, 675 (Tex. App.-Fort Worth 2014, pet. denied) (concluding no evidence conduct was "foreseeable in terms of its character and severity" because the details of prior incidents "var[ied] significantly" from what occurred here).

See Trammell Crow , 267 S.W.3d at 17 (finding attack "was so extraordinarily unlike any crime previously committed" that the defendant could not have reasonably foreseen or prevented it); see also Doe , 907 S.W.2d at 478 (stating that foreseeability requires more than an extraordinary sequence of events viewed in retrospect).

See Tex. R. Civ. P . 301 ("The judgment of the court shall conform to the pleadings....").

See Tex. R. Civ. P. 47(a) ; Horizon/CMS Healthcare Corp. v. Auld , 34 S.W.3d 887, 896-97 (Tex. 2000).

Auld , 34 S.W.3d at 897.

Heritage Gulf Props., Ltd. v. Sandalwood Apartments, Inc. , 416 S.W.3d 642, 658 (Tex. App.-Houston [14th Dist.] 2013, no pet.) (internal quotation marks omitted).

Roark v. Allen , 633 S.W.2d 804, 809 (Tex. 1982).

See Monsanto Co. v. Milam , 494 S.W.2d 534, 536 (Tex. 1973) (specific allegations in pleadings control over general allegations); Richardson v. First Nat'l Life Ins. Co. , 419 S.W.2d 836, 839 (Tex. 1967) (a plaintiff pleading both general and specific facts "cannot rely upon the general allegations but is confined in his recovery to those specifically and particularly pleaded [because] specific allegations will control those of a general character").

See Tex. R. Civ. P. 301.

Auld , 34 S.W.3d at 897.

See Heritage , 416 S.W.3d at 662.

See Tex. R. Civ. P. 65 ; FKM P'Ship v. Bd. of Regents of Univ. of Hous. Sys. , 255 S.W.3d 619, 633 (Tex. 2008).

See Tex. R. Civ. P. 67 ; Ingram v. Deere , 288 S.W.3d 886, 893 (Tex. 2009).

See Sage Street Assocs. v. Northdale Constr. Co. , 863 S.W.2d 438, 446 (Tex. 1993).

Id. (internal quotation marks and alterations omitted).

Moneyhon v. Moneyhon , 278 S.W.3d 874, 879 n.6 (Tex. App.-Houston [14th Dist.] 2009, no pet.).

See Tex. R. Civ. P. 301 ; Tex. Commerce Bank Nat'l Ass'n v. Geary , 938 S.W.2d 205, 214 (Tex. App.-Dallas 1997), rev'd on other grounds , 967 S.W.2d 836 (Tex. 1998).

See In re Lipsky , 460 S.W.3d 579, 593 (Tex. 2015) (orig. proceeding); Salinas v. Salinas , 365 S.W.3d 318, 320-21 (Tex. 2012).

See Del Lago Partners, Inc. v. Smith , 307 S.W.3d 762, 774 (Tex. 2010).

See ids="7328216" index="71" url="https://cite.case.law/sw3d/307/762/#p774">id. ; see also Doe v. Boys Clubs of Greater Dallas, Inc. , 907 S.W.2d 472, 477 (Tex. 1995) ("[E]ven if the injury would not have happened but for the defendant's conduct, the connection between the defendant and the plaintiff's injuries simply may be too attenuated to constitute legal cause."); Exxon Mobil Corp. v. Hines , 252 S.W.3d 496, 505-06 (Tex. App.-Houston [14th Dist.] 2008, pet. denied) (finding no causal connection between defamatory statements and injuries because the evidence showed other, distinct cause of injury).