

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-21-00320-CV

_____


KEITH D. AIKENS, Appellant

V.

CHARLENE K. DUELING, Appellee

---

On Appeal from the 48th District Court
Tarrant County, Texas
Trial Court No. 048-316423-20

---

Before Kerr, Bassel, and Walker, JJ.
Memorandum Opinion by Justice Bassel
Concurring and Dissenting Memorandum Opinion by Justice Walker

# MEMORANDUM OPINION

## I. Introduction

In a single issue, Appellant Keith D. Aikens challenges the trial court's order granting Appellee Charlene K. Dueling's traditional and no-evidence motion for summary judgment and ordering that Keith take nothing on his claims for negligence, gross negligence, and premises liability. Because we hold that Charlene owed no duty to Keith and because all three claims require the existence of a legal duty, we affirm the trial court's summary-judgment order.

## II. Background

The parties were formerly in a romantic relationship. After their romantic relationship ended, Keith and Charlene continued living together in Charlene's home, and he paid for the utilities.

After some time, the parties began dating other people. Charlene began dating Mr. Johnny W. Pettway. When Charlene informed Mr. Pettway that Keith lived in her home, Mr. Pettway expressed displeasure regarding the fact that she was allowing a former romantic partner to reside in her home. According to Keith's amended petition,

> Mr. Pettway became increasingly volatile regarding the living situation, and, on at least one occasion, threatened to "hurt [Keith] real bad." On information, belief, and material evidence, [Charlene], at all relevant times, was aware and had knowledge of Mr. Pettway's threat against [Keith]. Before the incident, Mr. Pettway clearly informed [Charlene] that he was a violent person by telling [her that] he had been arrested at least twice for assault. On at least one occasion, [Charlene's] response to

2

such a statement was, "I knew you had bad boy in you[,]" egging on Mr. Pettway's anger toward [Keith], all without the knowledge of [Keith]. On information and belief, despite her knowledge, [Charlene] continued to invite Mr. Pettway into the [r]esidence, without regard to Mr. Pettway's apparent anger problems with the living situation.

On the day in question, Keith returned to the residence after work, opened the garage door, and found Mr. Pettway in the garage. Mr. Pettway had a taser and discharged it, hitting Keith in the chest; Mr. Pettway also hit Keith with a police baton. Keith retrieved his pistol from his pocket and shot Mr. Pettway in the stomach. Keith spent three days in the hospital due to the injuries that he sustained; Mr. Pettway died several days after the shooting.

Instead of suing Mr. Pettway's estate, Keith filed suit against Charlene, alleging causes of action for negligence, premises liability, and gross negligence. Keith alleged that Charlene knew of Mr. Pettway's hostility toward Keith and did not take reasonable precautions to mitigate the danger to Keith but instead invited Mr. Pettway to the residence. Keith further alleged that Charlene's negligent acts were the proximate cause of his severe personal injuries.

Charlene filed a combined traditional and no-evidence motion for summary judgment on all causes of action pleaded by Keith.[1] Charlene argued that Keith's case

---

[1]Although Keith filed an amended petition after Charlene filed her summary-judgment motion, he did not add any additional independently viable causes of action to the lawsuit that would have necessitated Charlene's amending her summary-judgment motion. *See generally Haferkamp v. SSC Waco Greenview Operating Co.*, No. 10-10-00171-CV, 2012 WL 851679, at *2 (Tex. App.—Waco Mar. 14, 2012, pet. denied) (mem. op.) (setting forth general rule requiring a movant to amend or supplement a

3

was built entirely on speculation, that she did not owe a duty to Keith, that her actions were not the proximate cause of Keith's damages, and that this is not a premises-liability case because there was no "state of being of the property itself" that posed an unreasonable risk of harm. A response, a reply, and supplemental briefing were filed.[2] Keith also lodged various objections to Charlene's summary-judgment evidence, and Charlene responded; the trial court overruled Keith's objections. After hearing the motion, the trial court signed a final order granting Charlene's summary-judgment motion, stating that Keith take nothing, and dismissing with prejudice all of Keith's claims against Charlene.

Keith then perfected this appeal.

### III. Analysis

In his sole issue, Keith argues that the trial court erred by granting Charlene's motion for summary judgment. Keith's claims—negligence, gross negligence, and premises liability—all hinge on the existence of a legal duty, which we hold is not

---

pending summary-judgment motion to address newly added claims in a subsequent petition and holding that newly added theories of how appellees had breached their duty to appellant did not bar summary judgment when appellees conclusively established that their alleged breach was not the proximate cause of appellant's injuries).

[2]Keith also filed a ninety-five-page sur-reply, but the trial court stated that it would not consider that document because Keith did not seek leave of court to file a sur-reply.

present in the facts before us.[3]  Accordingly, as we explain below, summary judgment was proper.

## A.    Standard of Review

We review a summary judgment de novo.  *Travelers Ins. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010).  We consider the evidence presented in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could, and disregarding evidence contrary to the nonmovant unless reasonable jurors could not.  *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009).  We indulge every reasonable inference and resolve any doubts in the

---

[3]The dissent concludes that Keith presented no argument on appeal that Charlene had a duty under a general negligence theory and would hold that Keith waived by inadequate briefing any complaint regarding the trial court's grant of summary judgment on his negligence and gross-negligence claims.  While Keith's brief is not a model of clarity because it does not present his arguments based on the theories he alleged but rather attacks elements—many of which are the same for both his negligence claim and his premises-liability claim—Keith specifically mentions his negligence claim in his summary of the argument, stating that Charlene attacked his negligence ground in her summary-judgment motion based on no general duty between romantic partners.  Charlene appears to have concluded that this was enough to demonstrate that Keith was attacking the negligence issue on appeal.  She states in her brief that this appeal "involves a straightforward application of common law negligence claims and tort elements" and then argues that "[a]ny claim [Keith] alleged is contingent upon a duty that [Charlene] owed him."  She therefore did not believe that Keith had failed to challenge the trial court's grant of summary judgment on his negligence claims.  Because duty is an element in each of the claims pleaded by Keith and because the duty element is challenged on appeal, we therefore conclude that Keith did not waive his challenge to the summary judgment on his negligence claim.

Charlene did, however, point out that Keith's brief's sole mention of his gross-negligence claim is in his prayer.  As discussed below, based on our disposition of Keith's negligence claim, his gross-negligence claim must also fail.  We therefore discuss the two claims together.

nonmovant's favor. *20801, Inc. v. Parker*, 249 S.W.3d 392, 399 (Tex. 2008). A defendant who conclusively negates at least one essential element of a plaintiff's cause of action is entitled to summary judgment on that claim under Rule 166a(c). *Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 508 (Tex. 2010); *see* Tex. R. Civ. P. 166a(b), (c).

After an adequate time for discovery, the party without the burden of proof may, without presenting evidence, move for summary judgment under Rule 166a(i) on the ground that no evidence supports an essential element of the nonmovant's claim or defense. Tex. R. Civ. P. 166a(i). The motion must specifically state the elements for which no evidence exists. *Id.*; *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 310 (Tex. 2009). The trial court must grant the motion unless the nonmovant produces summary-judgment evidence that raises a genuine, material fact issue. *See* Tex. R. Civ. P. 166a(i) & 1997 cmt.; *B.C. v. Steak N Shake Operations, Inc.*, 598 S.W.3d 256, 259 (Tex. 2020).

When reviewing a no-evidence summary judgment, we examine the entire record in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the motion. *Sudan v. Sudan*, 199 S.W.3d 291, 292 (Tex. 2006). We review a no-evidence summary judgment for evidence that would enable reasonable and fair-minded jurors to differ in their conclusions. *Hamilton v. Wilson*, 249 S.W.3d 425, 426 (Tex. 2008) (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005)). We credit evidence favorable to the nonmovant if reasonable jurors could, and we disregard evidence contrary to the nonmovant unless

reasonable jurors could not. *Timpte Indus.*, 286 S.W.3d at 310 (citing *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006)). If the nonmovant brings forward more than a scintilla of probative evidence that raises a genuine issue of material fact, then a no-evidence summary judgment is not proper. *Smith v. O'Donnell*, 288 S.W.3d 417, 424 (Tex. 2009); *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003).

When a party moves for summary judgment under both Rules 166a(c) and 166a(i), we will first review the trial court's judgment under the standards of Rule 166a(i). *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004). If the appellant failed to produce more than a scintilla of evidence under that burden, there is no need to analyze whether the appellee's summary-judgment proof satisfied the Rule 166a(c) burden. *Id.*

### B. No Evidence of Duty to Support Negligence and Gross-Negligence Claims

We begin by addressing Keith's negligence and gross-negligence claims. "The elements of a negligence cause of action are the existence of a legal duty, a breach of that duty, and damages proximately caused by the breach." *IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason*, 143 S.W.3d 794, 798 (Tex. 2004). Charlene obtained summary judgment on, among other things, the absence of a legal duty. The Tyler Court of Appeals, in an employment case that Charlene relies on in her brief, explains the legal-duty element:

7

## Legal Duty

Whether a duty exists is a threshold inquiry. *Kroger Co. v. Elwood*, 197 S.W.3d 793, 794 (Tex. 2006). A party who has no duty cannot be liable for negligence. *Id.* The existence of a duty is a question of law determined based on the facts surrounding the occurrence. *Pagayon v. Exxon Mobil Corp.*, 536 S.W.3d 499, 503 (Tex. 2017).

No general duty to control others currently exists in Texas. . . . *See id.* at 504. . . .

*Douglas v. Hardy*, 600 S.W.3d 358, 367 (Tex. App.—Tyler 2019, no pet.).

In determining whether a common-law negligence duty exists, we consider several factors, including foreseeability. *See Pagayon*, 536 S.W.3d at 503–04. As the Tyler Court of Appeals further explained in *Douglas*,

The question of foreseeability, and proximate cause generally, involves a practical inquiry based on "common experience applied to human conduct." [*Doe v. Boys Club of Greater Dall., Inc.*, 907 S.W.2d 472,] 478[ (Tex. 1995)]. It asks whether the injury "might reasonably have been contemplated" as a result of the defendant's conduct. *Id.* Harm is foreseeable if a person of ordinary intelligence should have anticipated the danger created by an act or omission. *Bos v. Smith*, 556 S.W.3d 293, 303 (Tex. 2018). The exact sequence of events need not be foreseeable, but the conduct must be sufficiently similar to give the defendant notice of the general nature of the danger. *Id.* However, foreseeability requires more than someone, viewing the facts in retrospect, theorizing an extraordinary sequence of events whereby the defendant's conduct brings about the injury. *Doe*, 907 S.W.2d at 478. The foreseeability requirement "protects the owners and controllers of land from liability for crimes that are so random, extraordinary, or otherwise disconnected from them that they could not reasonably be expected to foresee or prevent the crimes." *Trammell Crow Cent. Tex., Ltd. v. Gutierrez*, 267 S.W.3d 9, 17 (Tex. 2008).

600 S.W.3d at 368–69.

Here, Keith argues that Charlene fomented conflict between Keith and Mr. Pettway and the confrontation that occurred because "[t]he evidence show[ed] that she loved two men simultaneously, was jealous of [Keith's] new love interest, and was unwilling to let either of them go, resulting in her ignoring the clear signs that Mr. Pettway was a risk to [Keith]." In essence, this theme suggests that Charlene orchestrated the confrontation between the two men. Placing such a florid theme on Charlene's conduct is not supported by the record, which contains evidence that Charlene told Keith in advance of Mr. Pettway's visit and that she was unaware of his plans to attack Keith.

With regard to Keith's negligence claim, the evidence that he submitted to attempt to rebut Charlene's motion for summary judgment included Charlene's deposition, text messages between Charlene and Mr. Pettway, text messages between Charlene's son and Mr. Pettway, and Keith's deposition. After additional discovery was conducted, Charlene filed a supplemental brief in support of her motion and attached the deposition from the detective who investigated the shooting.

The record reflects that Charlene started dating Mr. Pettway in September 2019 and that he was not pleased after learning on their first date that her ex-boyfriend Keith was living with her. The text messages between Charlene and Mr. Pettway reflect the following exchanges on October 3, 2019, which was one month before the November 3, 2019 incident when Mr. Pettway used a taser on Keith:

[Mr. Pettway:] Who will yell at you? Oh the pissant David!

[Charlene:]  Yes that pissant[.]

[Mr. Pettway:]  You know what?  He's going to force me to hurt him real bad.

[Charlene:]  No no don't even go there.  It's my fault I let this go on for so long.  I never want it to jeopardize[] us as it already did.  But God was persistent and made us happen.  That's all I care about.  This is my last outing planned with the [motorcycle] group until July.  If I'm even involved anymore at that time.

[Mr. Pettway:]  Then stop taking his shit!  He's not going anywhere.

[Charlene:]  Yes Dear . . . [.]

[Mr. Pettway:]  I don't take no shit[, and] neither does my woman!  Get like a momma bear with cubs.  Pissant is not going anywhere.  [P]ut a stop to this bullshit right now.

[Charlene:]  10-4[.]  [Y]ou['re] the wind beneath my wings[.]

[Mr. Pettway:]  I have been arrested []two different times for assault.  FYI.

[Charlene:]  Oh no . . . [.]

[Charlene:]  I knew you had bad boy in you lol[.]

[Mr. Pettway:]  I don't like it!  But I can be a mean motherfucker.

[Charlene:]  Enough of this[,] ok?

At her deposition in May 2021, Charlene was asked about her knowledge of Mr. Pettway's assaults.  She testified that Mr. Pettway never told her when the arrests had occurred and said that they could have happened when he was in high school.  Keith delved into the arrests and found that one involved domestic violence.

10

Keith testified that Charlene expressed to him several times how much Mr. Pettway hated him. Keith also testified about events that occurred during the week before the incident. He said that on Sunday, October 27 (exactly one week before the incident), Charlene told Mr. Pettway that Keith and her son were fighting over her motorcycle that she had wrecked; according to Keith, Mr. Pettway told Charlene that she was her family's worst nightmare and broke up with her "for about the fourth or fifth time." Two days later, on the Tuesday preceding the incident, Charlene told Keith that "this ha[d] escalated way faster than [she] thought" and that Mr. Pettway wanted Keith out of the house immediately. Charlene instructed Keith to rent a storage room so that she could maybe calm down Mr. Pettway. Keith did not lease a storage facility but did purchase storage boxes so that he could start packing his belongings because he planned to move out.[4] On the Thursday before the incident, Charlene asked Keith what he was doing for the weekend; he responded that he was going hunting. Charlene then said that Mr. Pettway was coming for the weekend. Keith said that he interpreted what Charlene had told him to mean that there would be physical violence. Keith told Charlene, "[H]e's coming here to get to

_____

[4]On that same Tuesday, Mr. Pettway texted Charlene's son's girlfriend to say that when Charlene's son was ready to go "take care of" Keith regarding the motorcycle incident (i.e., Keith had offered to purchase Charlene's wrecked motorcycle for $800, but her son thought it was worth more and did not appreciate Keith's low offer), then Charlene's son should call Mr. Pettway; Mr. Pettway stated that he "would take off work and he would go with him and have his back." Keith did not learn about this text until after he was released from the hospital following the November 3 incident.

me." Charlene responded, "He's not going to hurt you," but Keith said, "Charlene, the man is coming here after me." Keith testified that Charlene went and picked up Mr. Pettway on Friday and brought him to the residence, "knowing that he hated [Keith], that he meant [Keith] harm."

But Keith testified that he had no evidence that at the time of the incident Charlene knew that Mr. Pettway was in the garage. Keith further testified that he had no evidence that Charlene knew that Keith was home and near the garage at the time of the incident. Keith admitted that Mr. Pettway was a bigger part of the incident than Charlene.

During Charlene's deposition, she testified that she had told Keith the week prior that she was bringing Mr. Pettway to the residence. When she brought Mr. Pettway to the residence on Friday evening, Keith was working, and they did not see him on Saturday because they "had a lot of stuff to do on Saturday, and then Sunday is when all that went down."

Charlene explained that on Sunday morning, Mr. Pettway was already up when she woke up. He told her that he was irritable, that he needed coffee, and that he wanted them to go get breakfast. Charlene said that she needed to fix her hair, so she left the kitchen and returned to her bathroom. While she was in the bathroom curling her hair, she heard four pops.[5]

---

[5]Keith testified that he shot Mr. Pettway "one time."

Charlene testified that she had no idea or any reason to believe that Mr. Pettway had brought any weapons to her home and only learned after the incident that Mr. Pettway's overnight bag contained weapons (in addition to the taser and the baton that he used) and that he had not packed any clothes.[6] Charlene also did not have any idea on that Sunday morning that Mr. Pettway was going to attack Keith; Mr. Pettway did not ever tell her that he was going to attack Keith, and the two men had never even spoken to each other prior to the shooting. She further testified that she did not have any reason to believe that Mr. Pettway was capable of attacking another person.

Detective John Tham investigated the incident and never listed Charlene as a suspect because he did not believe that she had helped Mr. Pettway plan the attack on Keith. Detective Tham concluded that Charlene was unaware of Mr. Pettway's intention to harm Keith. Detective Tham said that none of the texts between Charlene and Mr. Pettway explicitly mentioned an assault on Keith and that there was no evidence that Charlene had pushed Mr. Pettway to assault Keith. Detective Tham saw the text in which Mr. Pettway had threatened to harm Keith, but Detective Tham

[6]Charlene testified that sometimes Mr. Pettway carried a taser when they went "bike riding"; that everybody took a gun or some weapon when they were on the road; and that when they were not riding, the taser "just laid on the stove." Charlene said that Mr. Pettway did not have a taser on his person on Saturday because they "weren't on the bike" and that she did not recall seeing the taser on Mr. Pettway's person on Sunday morning. Keith, however, testified that Charlene had told him that Mr. Pettway carried a taser "like a pistol in a holster on his hip at all times" and that "everywhere they went[,] he carried that like a pistol."

13

did not see that as an active threat. Moreover, Keith told Detective Tham that the day before the offense, Mr. Pettway came to the house to spend time with Charlene; he (Keith) went to his room after he got home from work that morning and did not have any interactions with Charlene and Mr. Pettway; and he (Keith) left for work that evening without any issue. Detective Tham testified that this was evidence that both men had been in the home at the same time without any incident or altercation on Saturday.

Despite Keith's allegations that Charlene orchestrated the confrontation, the question instead turns on whether the blustering statements made by Mr. Pettway in early October made it reasonably foreseeable that Mr. Pettway would bring his taser and a police baton, as well as other weapons, to Charlene's and use them on Keith one month later when the two men had never spoken to each other prior to the shooting and had co-existed in the home the day prior to the incident without any words or altercations. We cannot say that Keith brought forward more than a scintilla of probative evidence that raises a genuine issue of material fact on whether Charlene owed a legal duty to prevent Keith from being assaulted by Mr. Pettway with a taser and a police baton because such assault was not reasonably foreseeable. *See generally Watanabe v. Summit Path Partners, LLC*, No. 01-19-00302-CV, 2021 WL 3501542, at *9 (Tex. App.—Houston [1st Dist.] Aug. 10, 2021, no pet.) ("Only after foreseeability has been established . . . will a court determine the parameters of the defendant's duty." (citing *Timberwalk Apartments, Partners, Inc. v. Cain*, 972 S.W.2d 749, 757 (Tex.

14

1998))).  We hold that Charlene owed Keith no duty to prevent Mr. Pettway's assault on Keith because the general rule of no duty to control others applies here to relieve Charlene of any duty to control the actions of her then-boyfriend—Mr. Pettway.  *Cf. Douglas*, 600 S.W.3d at 371; *Hani v. Jimenez*, 264 S.W.3d 881, 886 (Tex. App.—Dallas 2008, pet. denied) ("[A]lthough spouses and family members may have a moral duty to exercise care toward one another, a legal duty to prevent harm does not arise from the familial relationship.").  Without a legal duty, Charlene cannot be liable for Keith's negligence claim as a matter of law.

Moreover, without evidence of negligence, there can be no gross negligence to support exemplary damages.  *Douglas*, 600 S.W.3d at 372.  *See generally Boerjan v. Rodriguez*, 436 S.W.3d 307, 311 (Tex. 2014) (setting forth gross-negligence elements).  Accordingly, we hold that the trial court properly granted summary judgment on Keith's negligence and gross-negligence claims.

### C.     No Evidence to Support Premises-Liability Claim

Keith also asserted a premises-liability claim against Charlene, seeking to hold Charlene liable in her role as a landowner for an alleged duty based on Mr. Pettway's actions as a third party who committed criminal acts against Keith while on Charlene's property.  As explained below, no evidence supports the existence of any premises-liability claim.

We again borrow from *Douglas*, which summarized the law on premises-liability claims:

15

In a premises liability case, the plaintiff must establish a duty owed to the plaintiff, breach of that duty, and damages proximately caused by the breach. *Del Lago Partners*[*, Inc. v. Smith*], 307 S.W.3d [762,] 767[ (Tex. 2010)]. Generally, a premises owner has no duty to protect invitees, such as tenants, from criminal acts by third parties. *See Timberwalk*, 972 S.W.2d at 756. But there is an exception when the owner knows or has reason to know of a risk of harm to invitees that is both unreasonable and foreseeable. *Id.* Foreseeability requires that the general danger, and not necessarily the exact sequence of events that produced the harm, be foreseeable. *See id.* When the "general danger" is the risk of injury from criminal activity by third parties, the evidence must reveal specific previous crimes on or near the premises to establish foreseeability. *Id.* The supreme court has recognized that "crime is increasingly random and violent and may occur anywhere" and rejected the imposition of a general duty on landlords to protect tenants whenever crime might occur. *See Del Lago Partners*, 307 S.W.3d at 768. When the premises owner has no direct knowledge that criminal conduct is imminent, the plaintiff must present evidence showing past criminal conduct made similar conduct in the future foreseeable. *See id.* Whether past incidents of criminal conduct make future incidents foreseeable depends upon factors such as proximity, recency, frequency, similarity, and publicity. *Id.*

600 S.W.3d at 372–73.

Keith argues that he was an invitee to whom Charlene owed a legal duty. As noted above, a premises owner has no duty to protect invitees from criminal acts by third parties unless the owner knows or has reason to know of a risk of harm to invitees that is both unreasonable and foreseeable; in other words, the evidence must reveal specific previous crimes on or near the premises to establish foreseeability. *See id.* The record in this case shows that Keith presented no evidence of any recent criminal activities on or near Charlene's premises similar to the incident in question. Therefore, the trial court correctly granted summary judgment in Charlene's favor on the *Timberwalk* premises-liability theory. *See id.* at 373 (citing *Timberwalk*, 972 S.W.2d at 756).

16

Keith also appears to argue that Charlene owed a duty to him under the analysis set forth by the Texas Supreme Court in *Del Lago*. In *Del Lago*, the supreme court asserted that "criminal misconduct is sometimes foreseeable because of immediately preceding conduct"; for example, "when a property owner []by reason of . . . observation or past experience[] should reasonably anticipate criminal conduct on the part of third persons," then the property owner "has a duty to take precautions against it." 307 S.W.3d at 769. "This duty is recognized because []the party with the power of control or expulsion is in the best position to protect against the harm." *Id.* But here, there is no evidence that Charlene had direct knowledge of an imminent confrontation between Mr. Pettway and Keith as the two men had never spoken to each other prior to the shooting. Nor was there any evidence that Charlene had the time or the means to defuse the situation when it occurred. The evidence reflects that although Charlene was in the home on the day of the incident, she was in her bathroom fixing her hair and did not know that Mr. Pettway was in the garage waiting for Keith to arrive home from work so that he could assault him. The evidence further reflects that Charlene did not know that Keith had returned home from work until he came inside to tell her that Mr. Pettway had attacked him. Moreover, despite Mr. Pettway's prior text messages to Charlene expressing his disapproval of her living situation with Keith, such messages did not impart to Charlene direct knowledge of an imminent conflict; she did not know that Mr. Pettway had brought weapons to her house and did not know that Mr. Pettway was going to attack Keith on Sunday

17

morning after she brought Mr. Pettway to the residence on Friday evening. And

Detective Tham did not view Mr. Pettway's prior texts to Charlene as an active threat.

Accordingly, we hold that the analysis in *Del Lago* is inapplicable as a matter of law.

*See Douglas*, 600 S.W.3d at 373; *Taylor v. Louis*, 349 S.W.3d 729, 732, 736–37 (Tex.

App.—Houston [14th Dist.] 2011, no pet.) (holding that facts bore no resemblance to

*Del Lago* when boyfriend was assaulted in girlfriend's home by her ex-husband

without warning, boyfriend was not an invitee, the attack was not preceded by an

extended period of threatening and aggressive behavior, and there was no evidence

that homeowner had ample time and means to defuse the situation).[7]

---

[7]The dissent states that the *Timberwalk* factors are inapplicable when the property owner has direct knowledge that criminal conduct is imminent and contends that we should instead apply the *Del Lago* factors. Concurring and Dissenting Op. at 5. As explained in our analysis, we conclude that Charlene did not have direct knowledge that criminal conduct was imminent; thus, we properly used the *Timberwalk* factors to guide our analysis. Additionally, the dissent's analysis of the *Del Lago* factors, which characterizes "the nature and character of the premises" as "important," omits that there is no evidence that Charlene's house was a place of frequent skirmishes and speculates as to what could happen there based merely on the parties' living arrangement, which "would be a source of turmoil in a relationship between the two men," while ignoring that the two men had never met or spoken to each other until after the assault. *Id.* at 7–8. Moreover, the record negates the dissent's contention that "[i]t is reasonable to infer that, had Keith known of the violent risk posed by Mr. Pettway, he would not have come to the house at all knowing that Mr. Pettway was also there." *Id.* at 10. The record demonstrates that Charlene warned Keith that Mr. Pettway would be in the home on the weekend in question and that upon hearing just that news (and not knowing about Mr. Pettway's prior arrests), Keith repeatedly expressed concern about his safety, but he did not attempt to avoid the home that weekend. Thus, even if we were to assume that Charlene owed a duty to Keith, we would conclude that she fulfilled such duty by giving Keith advance notice that Mr. Pettway was coming to the home on the

18

Furthermore, aside from Charlene's alleged duties as a premises owner to prevent foreseeable criminal acts, it appears that Keith also argues that Charlene owed him a general duty "to make the condition reasonably safe" for him while he was at the residence. Keith's injuries, however, did not arise from a "condition" on the property—which focuses on the state of being of the property itself as opposed to negligent activity. *See Douglas*, 600 S.W.3d at 374 (citing *4Front Engineered Sols., Inc. v. Rosales*, 505 S.W.3d 905, 912 (Tex. 2016)). Mr. Pettway's action in using a taser on Keith is not a condition of Charlene's premises that created an unreasonable risk of harm apart from the *Timberwalk* and *Del Lago* premises claims and does not support an independent premises-liability claim as a matter of law. *See id.*

Accordingly, we hold that the trial court properly granted summary judgment on Keith's premises-liability claim.

## IV. Conclusion

Having held that the trial court properly granted summary judgment on all of Keith's claims, we overrule his sole issue and affirm the trial court's summary judgment.

/s/ Dabney Bassel

Dabney Bassel
Justice

Delivered: August 25, 2022

---

weekend in question such that Keith had the opportunity to choose to stay away from the home during that time.