**AFFIRMED in part; REVERSE and REMAND in part; and Opinion Filed January 11, 2022**



**In The**

**Court of Appeals**
**Fifth District of Texas at Dallas**

_____

**No. 05-19-01202-CV**
_____

**HADDINGTON FUND, LP AND JB WEALTH MANAGEMENT, LLC, Appellant**

**V.**

**BRADLEY S. KIDWELL, BRADLEY S. KIDWELL FAMILY LIMITED PARTNERSHIP, MARY COE KIDWELL, Appellees**

**On Appeal from the 429th Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 429-02197-2016**

## MEMORANDUM OPINION

Before Justices Molberg, Goldstein, and Smith
Opinion by Justice Goldstein

This is an appeal from a final judgment related to a foreclosure sale of real property after a trial by jury. In four issues, appellants complain that the trial court erred in awarding appellees surplus proceeds from the sale, awarding attorneys' fees to appellees, declining to submit one of appellees' counterclaims to arbitration, and refusing to admit certain bankruptcy filings into evidence. We reverse the trial court's judgment and remand this case to the trial court with instructions to refer

appellee Mary Coe Kidwell's claims to arbitration and for a partial new trial on appellants' deficiency claim, as detailed below. Because all dispositive issues are settled in law, we issue this memorandum opinion. *See* TEX. R. APP. P. 47.2(a).

## BACKGROUND

This case involves the historic Flour Mill building in McKinney, Texas. In January 2000, Brad Kidwell purchased the Flour Mill and the 1.7 acres of land it sits on from the prior owner. In 2002, Brad deeded the Flour Mill to the Bradley S. Kidwell Family Limited Partnership (KFLP), in which Brad and his wife Mary each hold fifty percent interests.[1] Sometime in 2006 or 2007, KFLP secured a mortgage on the Flour Mill from Bayview Loan Servicing, which, until the June 7, 2016 foreclosure that is the subject of this appeal, was the primary lienholder on the property.

One of the tenants of the Flour Mill in 2007 was an import company owned by James Bresnahan, a third-party defendant in the case below. In 2008, Bresnahan closed his import company and left the Flour Mill to pursue an investment career. He created appellant JB Wealth Management, LLC (JBWM) and appellant Haddington Fund, LP (Haddington). Bresnahan is the sole member of JBWM, which in turn is the managing partner of Haddington. Haddington invests in real estate

---

[1] For ease of reference, we will refer to appellees Brad Kidwell and Mary Kidwell by their first names. We will refer to Brad, Mary, and KFLP collectively as the Kidwells.

projects in North Texas, and Bresnahan offers limited partnership interests in Haddington to investors.

In 2010, Bresnahan reconnected with Brad to offer his financial services. The two also discussed a loan, and Bresnahan agreed to give Brad an unsecured loan to pay off existing credit card debt. Bresnahan also met with the Kidwells to discuss their overall financial goals. In October 2010, Bresnahan offered KFLP a service through JBWM that he called "My CFO." Under that service, JBWM would handle KFLP's accounting, file tax returns (including tax returns for previous years that had not been filed), prepare KFLP's financial statements, and manage KFLP's accounts payable and receivable. Bresnahan testified that after reviewing the Kidwells' finances, he decided he would not loan them any more money unless they accepted his services as the Flour Mill's chief financial officer. The Kidwells accepted.

Bresnahan also offered, through JBWM, to manage Mary's retirement account. In a November 15, 2010 document titled "Mary Kidwell Confidential Analysis," Bresnahan listed Mary's then-existing 401(k) account and noted its 2010 return on investment was 6.6%. The document states that if the funds had been invested in the "JB Wealth Management Vanguard Market ETF Portfolio," the return on investment would have been 18%. Mary accepted, and Bresnahan began managing Mary's investment account. Initially, Bresnahan converted the 401(k) into an IRA. Later, Bresnahan and the Kidwells discussed investing the IRA funds into

the Flour Mill. Although the parties dispute who had the idea, the record shows that in June 2011, Bresnahan forwarded Mary a subscription agreement, which provided that her IRA funds would be withdrawn and reinvested into Haddington at $50,000 per share. Mary signed the subscription agreement on June 17, 2011. Under the subscription agreement, Mary invested $197,000 of her IRA funds into Haddington.[2]

In the meantime, Brad was working with the City of McKinney and the McKinney Community Development Project (together, "the City") to renovate the Flour Mill. The projected cost of completion for KFLP's portion of the project was $1.7 million. To that end, Brad and Bresnahan discussed funding the project through loans by Haddington. On September 1, 2011, Haddington and KFLP entered into a series of loan agreements: a real estate lien note, a revolving credit agreement, and a security deed. Under the note and revolving credit agreement, Haddington opened $1.1 million line of credit against which KFLP could draw funds as needed to complete the renovation. The note was secured by the Flour Mill through the security deed, and by separate agreement Brad personally guaranteed the note.[3]

With funding in place, KFLP entered into a performance agreement with the City. Under the terms of that agreement, the City would upgrade the surrounding

---

[2] In 2017, while this lawsuit was pending, Haddington notified Mary that her IRA had not earned any interest and the IRS prohibits investors from investing IRA funds into their personal business.

[3] The parties also executed, on September 16, 2011, an absolute assignment of rents, which provided that, in the event of KFLP's default on the note, Haddington would be entitled to receive the rent payments on KFLP's existing leases at the Flour Mill.

infrastructure,[4] while KFLP would be responsible for renovating the building and parking lot.[5] Originally, the project was to be completed by December 2012. However, the project was not completed by then, and the City agreed to push back deadlines for KFLP's deliverables. In March 2014, KFLP and Haddington entered into an amendment to the note that increased the line of credit to $4 million.

On August 20, 2015, Haddington sent a letter of default alleging a separate lawsuit jeopardized Haddington's security interest in the Flour Mill. The letter stated Haddington would no longer advance funds on the line of credit and intended to call all unpaid advances as they became due, including a $110,000 payment that was to come due on October 8, 2015. In September 2015, KFLP terminated JBWM's position as CFO. On October 12, 2015, Haddington sent a follow-up letter demanding four missed payments and stating its intent to accelerate the loan if payment was not made. On December 14, 2015, Haddington sent a notice of acceleration to KFLP and demanded payment on the outstanding notes. Ten days later, KFLP filed for Chapter 11 bankruptcy. On December 28, 2015, Haddington sent KFLP a notice of trustee's sale, setting the foreclosure date for February 2, 2016.

---

[4] The City would construct pedestrian amenities, intersection improvements, bike connections, and street improvements to support the Historic Flour Mill mixed use development. Eighty percent of the project funds ($1,760,000) would be provided by the State of Texas and the remaining twenty percent by the City.

[5] KFLP's responsibilities were to be completed in phases. They included renovating the Flour Mill's event hall, adding parking spaces, bringing the Flour Mill up to code, and building out the third and fourth floors as residential units.

The bankruptcy court stayed the foreclosure and ordered KFLP to pay Haddington cash collateral in lieu of foreclosure. On May 6, 2016, the bankruptcy court found KFLP in default, lifted the stay, and allowed the foreclosure to proceed. The foreclosure sale was held on June 7, 2016. Haddington was the only bidder, and the trustee struck off the property to Haddington for $2 million.

On May 20, 2016, Haddington filed the instant lawsuit against Brad, individually, seeking enforcement of the guarantee agreement and declaratory judgment. Mary and KFLP intervened and, with Brad, filed various claims against Haddington and third-party claims against Bresnahan and JBWM. After the foreclosure, Haddington amended its petition to include a claim for deficiency, alleging the foreclosure proceeds were insufficient to cover the outstanding indebtedness on the notes. On March 22, 2017, Haddington, JBWM, and Bresnahan moved to compel arbitration of all of Mary's individual claims, including unjust enrichment, breach of fiduciary duty, DTPA violations, and violations of the Texas Securities Act. The trial court denied the motion. On July 14, 2017, Haddington, JBWM, and Bresnahan filed their amended motion to compel arbitration, which the trial court also denied.

The parties amended their pleadings numerous times prior to trial.[6] In its second amended petition, Haddington alleged that the proceeds from the foreclosure sale were insufficient to cover the indebtedness and asserted a deficiency claim for $1.1 million against KFLP and a suit on the guaranty agreement against Brad. Haddington also sought declaratory judgment that among other things, the foreclosure sale was valid and properly noticed. Finally, Haddington sought its attorneys' fees in pursuing the contract and declaratory judgment claims.

In their live answer at the time of trial, the Kidwells asserted affirmative defenses of payment, offset, prior material breach, and a request for the jury to determine the fair market value of the Flour Mill at the time of foreclosure. In their sixth amended counterclaim, the Kidwells asserted claims for breach of contract, waiver of the right to accelerate, fraud, fraudulent inducement, statutory fraud, unjust enrichment, breach of fiduciary duty, wrongful foreclosure, suit to quiet title, violations of the DTPA and Texas Securities Act, conversion, and tortious

---

[6] At the time of trial, the live pleadings were: (1) Plaintiff [Haddington]'s Second Amended Petition; (2) Bradley Scott Kidwell's Verified Fourth Amended Original Answer and Bradley S. Kidwell Family Limited Partnership's Verified Third Amended Original Answer, and Request for a Determination of the Fair Market Value of the Real Property as of the Date of the Foreclosure Sale; (3) Counter-Plaintiff/Third-Party Plaintiffs' Sixth Amended Original Verified Counterclaim and Third-Party Petition, Application for Temporary Restraining Order, and Request for Disclosure; and (4) Third-Party Defendants James Bresnahan and JB Wealth Management, LLC's Second Amended Answer. Also relevant is the Kidwells' Fifth Amended Counterclaim, their live pleading at the time the trial court denied appellants' amended motion to compel arbitration, which denial appellants challenge as their third issue.

interference. The Kidwells also sought an accounting, declaratory relief, attorneys' fees, and restoration of their title or return of their "equity of at least $1.75 million."

Trial was held from October 29 to November 2, 2018. At the close of evidence, Haddington moved for directed verdict on several of the Kidwells' claims and defenses. The parties agreed that the Kidwells' claims for conversion and tortious interference were withdrawn. The trial court granted directed verdict on the Kidwells' claims for trespass to try title and unjust enrichment. The remaining claims were submitted to the jury in thirty questions. In response to Question 1, the jury determined that the amount due on the loan immediately before foreclosure was $1,139,473. The jury also found that KFLP breached the loan agreements, Haddington did not, and Haddington was entitled to damages in the amount of $1,139,473. Regarding the Kidwells' claims, the jury found that: (1) JBWM did not breach its fiduciary duties to the Kidwells; (2) Haddington did not commit common law fraud, statutory fraud, or fraud in the inducement; (3) there were no irregularities in the June 7, 2016 foreclosure; (4) JBWM did not commit securities law violations; and (5) Haddington did not violate the DTPA. The jury found that JBWM violated the DTPA, though not knowingly, and Mary was entitled to $47,280 in damages. Finally, the jury awarded Haddington $425,000 in attorneys' fees and awarded Mary $310,000 in attorneys' fees.

Following trial, the Kidwells moved for judgment on the verdict. The Kidwells argued that because the Flour Mill was sold at foreclosure for $2 million and the jury found in response to Question 1 that there was only $1,139,473 owing on the debt, they were entitled to the surplus—$860,527. Haddington asked the trial court to set aside the jury's answer to Question 1 because there was no evidence to support that amount and no pleadings to support a surplus judgment. The Kidwells sought leave to amend their counterclaim to include a claim for surplus, to which Haddington objected on grounds that the added claim was surprising and prejudicial. The trial court granted the Kidwells leave to amend and entered judgment as follows: (1) in KFLP's favor for the surplus proceeds from the foreclosure sale in the amount of $860,527, plus pre- and post-judgment interest; (2) in Mary's favor on her DTPA claim in the amount of $47,280, plus pre- and post-judgment interest; and (3) in Mary's favor on attorneys' fees in the amount of $310,000, plus post-judgment interest. The trial court also ruled on Haddington's declaratory judgment claim and declared: (1) the June 7, 2016 foreclosure sale was valid and enforceable, (2) there were no defects or irregularities in the foreclosure sale, and (3) Haddington was the current owner of the Flour Mill. The trial court awarded Haddington $425,000 in attorneys' fees, plus post-judgment interest. After judgment, appellants moved for a new trial, which was denied. This appeal followed.

## DISCUSSION

Appellants raise four issues on appeal, namely, that the trial court erred in: (1) entering a surplus judgment in KFLP's favor because the evidence was legally and factually insufficient to support the jury's answer to Question 1, (2) awarding Mary attorneys' fees because her counsel failed to segregate recoverable from non-recoverable fees, (3) denying appellants' motion to compel arbitration, and (4) sustaining the Kidwells' objection to the introduction of certain bankruptcy records at trial.

## I.     ARBITRATION OF MARY'S CLAIMS

We begin with appellants' contention that Mary's claims arising out of the subscription agreement should have been severed and referred to arbitration. In general, a party seeking to compel arbitration must establish (1) the existence of a valid, enforceable arbitration agreement and (2) that the claims at issue fall within that agreement's scope. *Pilot Travel Centers, LLC v. McCray*, 416 S.W.3d 168, 177 (Tex. App.—Dallas 2013, no pet.) (citing *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 737 (Tex. 2005) (orig. proceeding)). The party seeking to avoid arbitration then bears the burden of raising an affirmative defense to enforcement of the otherwise valid arbitration provision. *Id.* (citing *In re AdvancePCS Health L.P.*, 172 S.W.3d 603, 607 (Tex. 2005)). In the absence of evidence of a valid defense, the trial court has no discretion—it must compel arbitration and stay its own

proceedings. *Seven Hills Commercial, LLC v. Mirabal Custom Homes, Inc.*, 442 S.W.3d 706, 715 (Tex. App.—Dallas 2014, pet. denied).

We review a trial court's order denying a motion to compel arbitration for abuse of discretion. *Henry v. Cash Biz, LP*, 551 S.W.3d 111, 115 (Tex. 2018). We defer to the trial court's factual determinations if they are supported by evidence but review its legal determinations de novo. *Id.* Whether the claims in dispute fall within the scope of a valid arbitration agreement is a question of law, which we review de novo. *Id.*

## A. Appellants' burden to prove a valid arbitration agreement that covers the claims in question

Appellants argue that they met their burden to show that Mary's claims arose out of a valid and enforceable arbitration agreement.[7] We agree. The arbitration agreement in question is contained in paragraph 5 of the subscription agreement. Under the subscription agreement, Mary purchased a limited partnership interest in Haddington, funded by Mary's personal IRA account. The arbitration clause states, in full:

> 5. Binding Arbitration. If a dispute arises out of or concerning this Agreement, such dispute shall be handled in accordance with the rules and regulations of the American Arbitration Association. Any such arbitration shall be in Collin County, Texas, the results of which shall

---

[7] The parties do not raise whether the Federal Arbitration Act (FAA) or the Texas Arbitration Act (TAA) applies. Because the issues before us relate to arbitrability, we do not address the question. *See Saxa Inc. v. DFD Architecture Inc.*, 312 S.W.3d 224, 229 n.4 (Tex. App.—Dallas 2010, pet. denied) ("The issue of arbitrability is subject to a virtually identical analysis under either the FAA or the TAA.").

be binding on all parties. Each party generally and unconditionally accepts the exclusive jurisdiction of such arbitration and to venue in the courts of Collin County to enforce any award of the arbitrators; consents to the service of process in any such action by certified or registered mailing; and waives any objection or defense of improper venue or forum non conveniens.

The subscription agreement bears Mary's signature, and the record indicates it was delivered to Bresnahan via email. We conclude that appellants met their burden to prove the existence of a valid and enforceable arbitration agreement.

At the time appellants moved to compel arbitration, the live pleading was the Kidwells' fifth amended counterclaim. In it, the Kidwells asserted claims related to both the Flour Mill and Mary's investment account. Mary's claims included that: (1) Haddington was unjustly enriched by fees it charged for managing her IRA; (2) Haddington and JBWM breached their fiduciary duty to Mary by failing to make certain disclosures related to her investment; and (3) Haddington and JBWM violated the DTPA by making certain misrepresentations about her investment to Mary and by unconscionably taking advantage of Mary to a grossly unfair degree.[8] Each of Mary's claims against Haddington and JBWM relate directly to her investment with Haddington. We therefore conclude that these claims fell within the

---

[8] The amended motion to compel arbitration was filed by Haddington, JBWM, and Bresnahan. However, only Haddington and JBWM filed a notice of appeal. Accordingly, we do not address whether the trial court erred in denying the motion to compel as to Bresnahan. *See* TEX. R. APP. P. 25.1(c).

scope of the subscription agreement's arbitration clause, and the trial court abused its discretion to the extent it held otherwise.

### B.     Mary's burden to prove defenses to arbitration

We now turn to Mary's defenses. Agreements to arbitrate are valid and enforceable, "save upon such grounds as exist at law or in equity for the revocation of any contract." *Sidley Austin Brown & Wood, LLP v. J.A. Green Dev. Corp.*, 327 S.W.3d 859, 863 (Tex. App.—Dallas 2010, no pet.) (analyzing arbitration agreement under the FAA). Generally applicable contract defenses under state law—such as fraud, duress, or unconscionability—may be applied to invalidate arbitration agreements. *See id.* Because of the strong policy favoring arbitration, any doubts in determining whether the defendant met its burden to prove an affirmative defense must be resolved in favor of arbitration. *Pilot Travel*, 416 S.W.3d at 177. Mary raises three defenses to arbitration, which we address in turn.

### 1.     *Intertwined Facts*

In her first defense, Mary contends that the issues related to her IRA account were inextricably intertwined with the remainder of the Kidwells' claims and therefore could not be arbitrated. Mary cites no authority, nor do we find any, for the proposition that a party may avoid arbitration when the underlying facts of the arbitrable and non-arbitrable claims are inextricably intertwined. On the contrary, "[e]ven when arbitrable and non-arbitrable claims are intertwined and arise out of

–13–

the same transaction, the arbitrable claims are still subject to arbitration." *In re Certain Underwriters at Lloyd's*, 18 S.W.3d 867, 875 (Tex. App.—Beaumont 2000, no pet.). If anything, the intertwined nature of the underlying facts is grounds for sweeping non-arbitrable claims into arbitration, not the other way around. *See Ascendant Anesthesia PLLC v. Abazi*, 348 S.W.3d 454, 462 (Tex. App.—Dallas 2011, no pet.) (claims that are factually intertwined with arbitrable claims or otherwise touch upon the subject matter of the agreement containing the arbitration provision are subject to the arbitration provision).

Because Mary's argument does not raise a valid defense to arbitration, we must reject it as a matter of law. We conclude the trial court erred to the extent it denied appellants' amended motion to compel arbitration on the ground that Mary's claims were inextricably intertwined with non-arbitrable claims.

### 2. *Fraud*

In her second defense, Mary argues that she was fraudulently induced into the subscription agreement. Fraud is an affirmative defense to the enforcement of a contract and may be used to invalidate an agreement to arbitrate. *Venture Cotton Co-op. v. Freeman*, 435 S.W.3d 222, 227 (Tex. 2014); *see also* TEX. R. CIV. P. 94. However, "challenges relating to an entire contract will not invalidate an arbitration provision in the contract; rather, challenges to an arbitration provision in a contract

must be directed specifically to that provision." *Royston, Rayzor, Vickery, & Williams, LLP v. Lopez*, 467 S.W.3d 494, 501 (Tex. 2015).

To support her fraud defense, Mary offered the testimony of Richard Sandow, the Kidwells' securities expert.[9] Sandow opined that Bresnahan committed securities fraud in violation of Securities and Exchange Commission (SEC) Rules 503–506 because the offering of shares in Haddington was not exempt from registration, contrary to the representations made in the subscription agreement. *See* 17 C.F.R. §§ 230.503–.506. Sandow also opined that Bresnahan committed securities fraud because he had no reasonable basis for believing Mary was an "accredited investor" as defined by the SEC. *See id.* § 203.501. On appeal, Mary argues that this evidence established that "the 'agreement' to arbitrate was procured as a result of fraud" and was thus invalid and unenforceable. We disagree. The evidence on which Mary relies at best supports a claim that the subscription agreement as a whole was procured by fraud, a question we do not decide. But it does not support her claim that the arbitration clause itself was procured by fraud. *See Lopez*, 467 S.W.3d at 501. The record contains no evidence that Bresnahan or appellants fraudulently induced Mary into the arbitration clause. Accordingly, we decline to invalidate the

---

[9] Sandow's testimony was taken at a temporary injunction hearing from September 9, 2016. By then, appellants had already foreclosed on the Flour Mill and were attempting to evict the Kidwells from the property. The Kidwells sought to enjoin their eviction and offered Sandow's testimony in support. Mary attached a partial transcript of that hearing to her response to appellants' motion to compel arbitration.

arbitration clause based on fraud.[10] *See In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 755 (Tex. 2001) (declining to invalidate an arbitration agreement on grounds of fraud where the allegedly fraudulent misrepresentations made no reference to the arbitration addendum to the parties' financing agreement). We conclude the trial court erred to the extent it denied appellants' amended motion to compel arbitration on the ground that the arbitration agreement was procured by fraud.

### 3. *Waiver*

In her third defense, Mary contends appellants implicitly waived their right to arbitration by their litigation conduct. Waiver is the "intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right." *LaLonde v. Gosnell*, 593 S.W.3d 212, 218–19 (Tex. 2019). The test for determining waiver by litigation conduct is two-pronged: (1) whether the party seeking arbitration substantially invoked the judicial process, and (2) whether the opposing party proved that it suffered prejudice as a result. *Perry Homes v. Cull*, 258 S.W.3d 580, 589–90 (Tex. 2008); *In re Bank One N.A.*, 216 S.W.3d 825, 827 (Tex. 2007). Because the law favors and encourages arbitration, the hurdle to prove waiver is a high one. *Id.*

---

[10] Related to her fraud claim, Mary also contends that the subscription agreement was presumptively unfair. Texas courts apply "a presumption of unfairness to transactions between a fiduciary and a party to whom he owes a duty of disclosure, thus casting on the fiduciary the burden to establish fairness." *Miller v. Miller*, 700 S.W.2d 941, 946 (Tex. App.—Dallas 1985, writ ref'd n.r.e.). Mary cites no authority, nor have we found any, applying the presumption of unfairness to an arbitration agreement. Mary further does not explain where the fiduciary's burden to establish fairness enters the burden-shifting scheme for determining whether a claim should be arbitrated. *See FirstMerit Bank*, 52 S.W.3d at 756. We determine the issue is inadequately briefed and therefore do not address it. TEX. R. APP. P. 38.1(i).

Whether a party waived its right to arbitration is a question of law we review de novo. *Kennedy Hodges, L.L.P. v. Gobellan*, 433 S.W.3d 542, 545 (Tex. 2014).

Mary argues that appellants substantially invoked the litigation process by propounding and responding to discovery and by waiting nearly ten months to invoke their right to arbitration. The conduct supporting waiver "must go beyond merely filing suit or seeking initial discovery." *Perry Homes*, 258 S.W.3d at 590. How much discovery is required to support waiver depends on the context: "three or four depositions may be all the discovery needed in one case, but purely preliminary in another." *Id.* at 593. Courts consider a variety of factors, including (1) how much discovery was conducted, (2) who initiated discovery, (3) whether the discovery related to the merits rather than arbitrability or standing, and (4) how much of the discovery would be useful in arbitration. *G.T. Leach Builders, LLC v. Sapphire V.P., LP*, 458 S.W.3d 502, 512 (Tex. 2015). Moreover, a party does not waive its right to arbitration merely by delay; the party urging waiver must establish that any delay resulted in prejudice. *Prudential Sec. Inc. v. Marshall*, 909 S.W.2d 896, 898–99 (Tex. 1995) (per curiam). Key factors in determining whether delay supports waiver include (1) the length of the delay, (2) the reasons for it, and (3) when the movant was aware of its arbitral rights. *Richmont Holdings, Inc. v. Superior Recharge Sys., L.L.C.*, 455 S.W.3d 573, 575 (Tex. 2014).

The record before us does not contain the discovery requests in question. Mary's response to appellants' amended motion to compel arbitration stated that appellants served responses to discovery in December 2016 and sent discovery requests of their own in February 2017. Appellants contend that the discovery they propounded was minimal, consisting of nine interrogatories, nine requests for admission, and one request for production. As no party attached any of the requests or responses to their filings in connection with the motions to compel arbitration, we cannot weigh any of the discovery-related factors in favor of or against waiver. *See Sipriano v. Reg'l Fin. Corp. of Tex.*, No. 05-15-00397-CV, 2016 WL 2905553, at *1 n.1 (Tex. App.—Dallas May 16, 2016, no pet.); *Garg v. Pham*, 485 S.W.3d 91, 111–12 (Tex. App.—Houston [14th Dist.] 2015, no pet.) ("Knowing the content of discovery is important in determining prejudice because when only a minimal amount of discovery has been conducted, which may also be useful for the purpose of arbitration, we may not infer waiver based upon prejudice."). Mary has not shown that the discovery in question was extensive, related to the merits of her claims, or would be unavailable in arbitration. *See In re Vesta Ins. Grp., Inc.*, 192 S.W.3d 759, 763 (Tex. 2006) ("Because Cashion offered none of [the relevant discovery requests] in the trial court and presented no details about any of them, the record does not show whether these requests were limited or extensive, whether they sought information for affirmative claims or defensive ones, or even whether they addressed

–18–

the merits or merely the arbitration issue."); *Marshall*, 909 S.W.2d at 899 (finding no prejudice where record did not contain discovery requests from movant); *see also Kennedy Hodges*, 433 S.W.3d 542, 545 (Tex. 2014) (party who litigates one claim with an opponent does not substantially invoke the litigation process for a related yet distinct claim against another party with whom it had an arbitration agreement).

Nor can we conclude that appellants' delay in seeking arbitration resulted in waiver. The supreme court has held that delays of six months to two years, even when considered alongside other factors, were not sufficient to show waiver. *See In re Fleetwood Homes of Tex., L.P.*, 257 S.W.3d 692, 694 (Tex. 2008) (per curiam) (defendant did not waive by "failing to pursue its arbitration demand for eight months while discussing a trial setting and allowing limited discovery"); *Vesta Ins. Grp.*, 192 S.W.3d at 763 (evidence insufficient to overcome presumption against waiver despite two-year delay and extensive discovery resulting in $200,000 in attorneys' fees); *In re Bruce Terminix Co.*, 988 S.W.2d 702, 704 (Tex. 1998) (per curiam) (defendant did not waive arbitration by its six-month delay and discovery requests, when the responses were insufficient to show prejudice); *EZ Pawn Corp. v. Mancias*, 934 S.W.2d 87, 89–90 (Tex. 1996) (per curiam) (in the absence of a showing of prejudice, defendants did not waive arbitration by, e.g., requesting discovery and waiting ten months to ask for arbitration). We conclude that the delay here is insufficient to support a finding of waiver.

The cases Mary relies on to support her argument are distinguishable. *See Adams v. StaxxRing, Inc.*, 344 S.W.3d 641 (Tex. App.—Dallas 2011, pet. denied); *First Cmty. Ins. Co. v. F-Con Contractors, Inc.*, No. 05-99-01088-CV, 2000 WL 274001, at *2 (Tex. App.—Dallas Mar. 14, 2000, no pet.) (mem. op.); *Cent. Nat. Ins. Co. of Omaha v. Lerner*, 856 S.W.2d 492, 494 (Tex. App.—Houston [1st Dist.] 1993, no writ). In *StaxxRing*, we held that Adams had waived his right to arbitrate because: (1) despite knowing about his right to arbitrate, he did not invoke it until "thirteen months of extensive and fast-paced litigation" had occurred; (2) trial had been reset twice, both times at his request or as a result of his conduct; (3) he served almost two hundred merit-based discovery requests, none of which went to issues of arbitrability, and obtained over 5,000 pages of documents in response; (4) he sought and obtained orders from the court compelling discovery and protection from discovery sent to him; (5) he obtained injunctive relief from the trial court, the order of which stated that he was "likely to prevail on the merits" and sought to hold another party in contempt of that order; (6) he filed a rule 12 motion to show authority and sought mandamus relief when it was denied (relief which would have been unavailable in arbitration); and (7) paid a jury fee. *See StaxxRing*, 344 S.W.3d at 648–50. In contrast, our record is silent as to how much discovery was requested, how much was produced, or what it was for. *See Vesta Ins. Grp.*, 192 S.W.3d at 763. There is also no evidence that appellants sought merits-based relief, or indeed any

other type of relief, related to Mary's claims. *See Kennedy Hodges*, 433 S.W.3d at 545 (party who litigates claim against one opponent does not substantially invoke the litigation process for a related yet distinct claim against another party with whom it had an arbitration agreement).

We also conclude that substantial invocation of the judicial process requires more consideration than merely noting that the movant filed an answer, asserted a counterclaim, engaged in discovery, and sought a continuance. *Cf. First Cmty.*, 2000 WL 274001, at *2; *Lerner*, 856 S.W.2d at 494. In *G.T. Leach*, the supreme court explained that "a party's litigation conduct aimed at defending itself and minimizing its litigation expenses, rather than taking advantage of the judicial forum, does not amount to substantial invocation of the judicial process." *G.T. Leach*, 458 S.W.3d at 513. The Court concluded that G.T. Leach had not waived its right to arbitrate despite having filed a counterclaim, designation of responsible third parties, motions to quash depositions, and a motion for continuance. The Court reasoned that the counterclaim was "defensive in nature" because it was a compulsory counterclaim G.T. Leach was required to file or risk losing altogether, and G.T. Leach never sought judgment on its merits. *See id.* at 513 (citing TEX. R. CIV. P. 97(a)). The Court concluded G.T. Leach's other filings were similarly "defensive, rather than offensive, in nature." *See id.*; *See also, Perry Homes,* 258 S.W.3d at 591 (one of the

factors federal courts consider in their waiver analysis is "whether the movant was plaintiff (who chose to file in court) or defendant (who merely responded)").

Here, appellants initiated this lawsuit but did not name Mary as a defendant. When Mary intervened and filed claims arising from the subscription agreement, appellants answered, but did not file any affirmative counterclaims against her. Filing an answer is by definition defensive in nature, as a defendant risks default and waiver of its affirmative defenses if it fails to file an answer. *See* TEX. R. CIV. P. 83, 94, 239. Appellants also engaged in discovery, but as explained above, we cannot determine from this record whether it supports waiver. *See Perry Homes*, 258 S.W.3d at 590–91. And although the trial court's docket sheet shows that appellants sought a continuance prior to being heard on their motion to compel arbitration, the motion for continuance is not in our record, and thus we cannot determine if it was "defensive in nature." *See G.T. Leach*, 458 S.W.3d at 513.

On this record, we conclude that Mary has not met her burden to show that appellants waived their right to arbitration. We reverse the portion of the trial court's judgment awarding Mary damages and pre- and post-judgment interest and remand to the trial court for referral of Mary's claims against appellants to arbitration. Additionally, because the trial court awarded Mary attorneys' fees on her claims, we reverse the trial court's award of attorneys' fees and remand to the trial court to submit Mary's attorneys' fee claim to arbitration. We do not reach appellants'

argument that the trial court erred in awarding attorneys' fees on grounds they were not segregated.

## II.     SURPLUS JUDGMENT

In their first issue, appellants contend that Haddington was entitled to a deficiency judgment and the trial court erred in entering a surplus judgment in favor of KFLP. They argue, in five sub-issues, that the trial court erred in entering a surplus judgment because the evidence was legally and factually insufficient to support the jury's answer to Question 1, the trial court abused its discretion in granting the Kidwells leave to amend their pleadings after the verdict to include a claim for surplus, the Kidwells waived any claim for surplus because they neither requested nor submitted a jury question seeking same, and the Kidwells failed to adequately plead payment as an affirmative defense.

### A.     Deficiency Claims and Section 51.003

In Texas, a mortgagee may foreclose on its lien and later sue to recover any deficiency—i.e., "the amount by which the debt and foreclosure costs exceed the foreclosure sale price." *Moayedi v. Interstate 35/Chisam Rd., L.P.*, 438 S.W.3d 1, 4–5 (Tex. 2014). To be entitled to recover the deficiency, the mortgagee must prove: (1) the amount due on the note at the time of foreclosure; (2) that proper notice of acceleration was given; (3) that a valid foreclosure sale was made; and (4) that he has given credit to the obligor for the amount received at the trustee's sale and any

other legitimate credit. *Thompson v. Chrysler First Bus. Credit Corp.*, 840 S.W.2d 25, 28 (Tex. App.—Dallas 1992, no writ).

In 1991, the Legislature enacted section 51.003 of the Property Code to "protect borrowers and guarantors" against low bids at a foreclosure sale. *Moayedi*, 438 S.W.3d at 4–5 (citing TEX. PROP. CODE ANN. § 51.003). Under section 51.003, the borrower in a deficiency suit may request a finding as to the fair market value of the property as of the date of the foreclosure sale. *PlainsCapital Bank v. Martin*, 459 S.W.3d 550, 555 (Tex. 2015). If the fair market value is greater than the foreclosure sale price, the borrower is entitled to an offset against the deficiency in the amount of the excess (less the amount of any obligations secured by the lien on the property but not extinguished by the foreclosure). *Id.* The right of offset under section 51.003 is an affirmative defense that must be pled and proved by the defendant. *Id.* at 557; *Moayedi*, 438 S.W.3d at 4–5.

Once the disputed facts are resolved by the factfinder, the deficiency claim "requires only a straightforward mathematical calculation." *See Lairsen v. Slutzky*, 80 S.W.3d 121, 130 (Tex. App.—Austin 2002, pet. denied). The deficiency is equal to: (a) the indebtedness immediately before foreclosure (b) minus the foreclosure sale price. If offset under section 51.003 was properly pled, the mortgagor is entitled to an offset equaling: (a) the difference between the fair market value of the property and the foreclosure sale price (b) minus the amount of any remaining claim,

indebtedness, or obligation of any kind that is secured by the lien that was not extinguished by the foreclosure. *See id.*; TEX. PROP. CODE ANN. § 51.003(c). If the resulting sum is a negative amount, there is no deficiency, but a surplus, which must be distributed in accordance with the deed of trust. *See Conversion Props., L.L.C. v. Kessler*, 994 S.W.2d 810, 813 (Tex. App.—Dallas 1999, pet. denied) ("If there are surplus proceeds generated by the foreclosure sale after paying the trustee's fees and expenses and the existing indebtedness secured by the foreclosed lien, they are distributed to inferior lienholders, or to the holder of the equity of redemption if there are no inferior lienholders.").

Here, the foreclosure sale price was undisputed; the Flour Mill was sold at foreclosure to Haddington for $2 million. Additionally, neither party has challenged the jury's finding as to the Flour Mill's fair market value at foreclosure: $2.68 million. The dispute on appeal concerns Question 1 of the charge, which asked:

> What was the amount of the unpaid balance, if any, including unpaid interest accrued, on the Note,[11] including all reasonable fees and expenses (other than attorney's fees) related to enforcing the Note and/or Deed of Trust, as of June 7, 2016, immediately before the foreclosure?[12]

---

[11] The charge defined "The Note" as "the promissory note originally dated September 1, 2011, given by the Kidwell Family LP to Haddington in the original principal amount of $1,100,000.00, as reinstated, modified, renewed and extended, from time to time, including the Real Estate Lien Notes dated, and [*sic*] July 7, 2014 and November 13, 2014, in the amount of up to $4,000,000.00."

[12] The charge defined "The Deed of Trust" as "the Deed of Trust filed for record in Collin County, Texas on or about September 16, 2011, which secures the Note, as restated, modified, renewed and extended from time to time."

The jury answered, "$1,139,473." Because the foreclosure sale price was greater than the amount of indebtedness found by the jury, the trial court entered judgment in favor of KFLP for the surplus in the amount of $860,527.

**B.    Legal Sufficiency**

*1.    Standard of Review*

When confronted by both a legal and factual sufficiency challenge, we address the legal sufficiency point first. *Glover v. Tex. Gen. Indem. Co.*, 619 S.W.2d 400, 401 (Tex. 1981). In a legal sufficiency challenge, we consider whether the evidence at trial would enable a reasonable and fair-minded fact finder to reach the verdict under review. *Gunn v. McCoy*, 554 S.W.3d 645, 658 (Tex. 2018). Evidence is legally insufficient to support a jury finding when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *Id.* In making this determination, we view the evidence in the light most favorable to the finding, crediting favorable evidence if a reasonable fact finder could, and disregarding contrary evidence unless a reasonable fact finder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 822, 827 (Tex. 2005). Where, as here, a party attacks the legal sufficiency of an adverse finding on an issue on which it has the burden of proof, we

apply a two-step approach: we first examine the record for evidence that supports the finding; if there no evidence to support the finding, we examine the entire record to determine if the contrary proposition is established as a matter of law. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001). We will sustain the legal sufficiency point only if the contrary proposition is conclusively established by the party bringing the challenge. *Compass Bank v. Goodman*, 416 S.W.3d 715, 719 (Tex. App.—Dallas 2013, pet. denied). As long as the evidence falls "within the zone of reasonable disagreement," we will not substitute our judgment for that of the fact-finder. *Whoa USA, Inc. v. Regan Properties, LLC*, No. 05-16-01283-CV, 2018 WL 1250234, at *3 (Tex. App.—Dallas Mar. 12, 2018, pet. denied) (quoting *City of Keller*, 168 S.W.3d at 822).

### 2.    *Analysis*

The parties dispute the loan amount, the amount of interest and fees that had accrued by the date of the foreclosure, and the amount of principal and interest KFLP repaid. As a preliminary step in the legal sufficiency analysis, we must identify the standard against which the evidence is to be measured. *See St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 530 (Tex. 2002). If an objection to the charge is preserved, we determine whether the charge submitted was erroneous and, if so, measure the sufficiency of the evidence against the correct standard. *See id.* If there has been no objection to the jury charge, however, then the charge actually submitted is the

proper measure of the sufficiency of the evidence. *Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000). Here, appellants did not object to Question 1. We must therefore determine whether the evidence is legally sufficient to support the jury's finding that $1,139,473 represents "the unpaid balance, if any, including unpaid interest accrued, on the Note, including all reasonable fees and expenses (other than attorney's fees) related to enforcing the Note and/or Deed of Trust" immediately before the June 7, 2016 foreclosure.

The evidence submitted at trial included the loan contracts signed by the parties in September 2011—the original note, deed of trust, revolving credit agreement, and absolute assignment of rents. Under the note and revolving credit agreement, KFLP was entitled to take draws from the line of credit, up to a limit of $1.1 million. The note was secured by the Flour Mill, as provided by the deed of trust. The deed of trust also provides that, in the event of a foreclosure, any proceeds "shall be applied as follows, in the following order: (i) to all reasonable costs and expenses of the sale, including, but not limited to reasonable trustee's fees and attorney's fees and costs of title evidence; (ii) to all sums secured by this Deed of Trust; and (iii) the excess, if any, to Grantors [i.e., KFLP] or such other person or persons entitled thereto by law." In addition to the original loan documents, appellants introduced two "updated" notes, dated March 5, 2012 and November 13, 2014, which were referenced in the charge's definition of "The Note." These updated

–28–

notes changed the interest rates of the original note and increased the line of credit from $1.1 million to $4 million.[13] Otherwise, the repayment terms of the notes did not change; KFLP was required to make interest payments[14] on each anniversary of each draw, to repay the principal up to $300,000 on the second anniversary of each draw, and to pay any remaining balance on or before September 1, 2016.

Appellants also introduced individual draw receipts, collectively admitted as Plaintiffs' Exhibit 7, and a summary sheet of draws, admitted as Plaintiffs' Exhibit 88. The draw receipts, each signed by Brad on behalf of KFLP, show the date and amount of the draws KFLP took against the revolving credit account. Exhibit 88 lists forty-seven individual draws totaling $2,248,170 loaned to KFLP. The total balance on the forty-seven draws, including accrued interest, regulatory fees, and late fees is $2,722,133. Exhibit 88 also lists eight additional items labeled "Other Deficient Notes Due at Foreclosure." These items reflect only dates and principal loan amounts and do not include interest or fees. The outstanding balance on these "other

---

[13] We will refer to the original note and the "updated" notes collectively as "the notes."

[14] The interest rates of the original note were tiered based on the outstanding unpaid principal borrowed against the line of credit—starting at 14% for the first $100,000 and reduced by 2% for each additional $100,000, to a minimum of 8% for any outstanding balance over $300,000. Any unpaid principal after the maturity date would be charged at the maximum legal rate. The first updated note eliminated the 8% interest tier, meaning any draws that increased the outstanding principal to above $200,000 would be charged 10% interest. The second updated note, dated November 13, 2014, eliminated all interest tiers, meaning all new draws would be charged at 14% interest regardless of the outstanding balance. At trial, appellants discounted the interest on all draws to 10%. We will therefore assume, for the purpose of this legal sufficiency challenge, that appellants waived their entitlement to any interest above 10% on any of the draws. Additionally, the record reflects KFLP was not entitled to the 8% interest rate of the original note because by the time the outstanding principal balance reached $300,000, the 8% interest tier had been eliminated by the first updated note.

deficient notes" at the time of foreclosure was $197,000.[15] Thus according to Exhibit 88, the total amount KFLP owed at the time of foreclosure was $2,919,133. Exhibit 88 then applies the foreclosure sales price ($2 million) as a credit against that debt and adds post-foreclosure interest ($220,340) through October 29, 2018, leaving a total balance of $1,139,473.[16]

The Kidwells argue that there was conflicting evidence about the total loan amount, and the jury was free to resolve the conflict in their favor. At trial, the Kidwells introduced the testimony of their accounting expert, Linda Milbourn. Milbourn reviewed the financial records for the Flour Mill, including the agreements, draw receipts, and QuickBooks entries made by Bresnahan while he was the Flour Mill's CFO. In conjunction with Milbourn's testimony, the Kidwells offered a spreadsheet[17] she prepared summarizing payments made from the Kidwells

---

[15] This was the same amount as Mary's IRA. The evidence was undisputed that Mary's IRA funds were deposited into Haddington. Another exhibit in the record, Plaintiffs' Exhibit 48, shows that Mary's IRA funds were distributed to KFLP in eight separate amounts. The dates and amounts of those distributions exactly match the dates and amounts on Exhibit 88 under "other deficient notes."

[16] This was the same amount as the jury's answer to Question 1. Appellants contend the jury transcribed the wrong number from Exhibit 88 to the charge; they should have written $2,919,133, the total amount due at foreclosure according to Exhibit 88. Because the precise amount, $1,139,473 appears nowhere else in the record, appellants argue, the jury's answer to Question 1 was the result of a clear mistake. A trial court can set aside a jury finding on the grounds of a unanimous *clerical* mistake but not when the finding results from misinterpretation of the evidence or the court's charge. *Shell Oil Co. v. Waxler*, 652 S.W.2d 454, 459 (Tex. App.—Houston [1st Dist.] 1983, writ ref'd n.r.e.) (citing *Adams v. Houston Lighting & Power Co.*, 158 Tex. 551, 556, 314 S.W.2d 826, 829 (1958)). The jury's answer to Question 1 involved interpreting the evidence and the charge, not merely transcribing a number. To the extent appellants argue that the trial court erred in failing to disregard the jury's answer to Question 1 on grounds that it was the result of a mistake, we reject the argument.

[17] The spreadsheet is labeled as Defendants' Exhibit 88. We will refer to it as "the spreadsheet" to avoid confusion with Plaintiffs' Exhibit 88.

to Haddington from January 11, 2011 through November 30, 2017, as reflected in QuickBooks.[18] The spreadsheet breaks down the QuickBooks entries by category, the first of which is labeled "loan principal." At the bottom of the spreadsheet, the subtotal for all loan principal entries is $856,941.36. When asked what that number reflects, Milbourn testified: "That is the total of all of the amounts that had been recorded in QuickBooks as loan principal for the period of time January 1, 2011, through November 30, 2017 from -- in the account Haddington Fund, LP." The Kidwells claim the jury could have concluded, based on Milbourn's testimony and the spreadsheet, that $856,941.36 was the total amount KFLP borrowed against the line of credit. They suggest the jury could have added 10% interest ($85,694) to that principal and then added the amount of "other deficient notes" in Exhibit 88 ($197,000) to arrive at the total indebtedness at foreclosure. Because the sum of that calculation ($1,139,635) is less than two-hundred dollars away from the jury's answer to Question 1 ($1,139,473), the Kidwells argue, the jury's verdict was supported by legally sufficient evidence. *See Gulf States Utils. Co. v. Low*, 79

---

[18] Each row in the spreadsheet corresponds to the individual transactions recorded into QuickBooks. The first column reflects the transaction date and the next seven columns reflect how each transaction was categorized. The eighth column shows the total for the row and the ninth and final column reflects the "memo" entry from QuickBooks for each row (i.e., for each transaction). For example, the entry for March 20, 2014 lists $9,000 in the column for Interest payments (third column) and $450 for Reg Fee payments (fourth column). The rest of the category columns are blank. The entry has a transaction total of $9,450 (ninth column) and a memo (tenth column) stating: "9k interest on 90k loan plus 450 reg fee."

S.W.3d 561, 566 (Tex. 2002) ("The jury generally has discretion to award damages within the range of evidence presented at trial.").

Appellants respond that Milbourn's testimony is legally insufficient to support the jury's answer to Question 1.[19] We agree. When a scientific opinion is admitted in evidence without objection, it may be considered probative evidence even if the basis for the opinion is unreliable. *City of San Antonio v. Pollock*, 284 S.W.3d 809, 818 (Tex. 2009). But if no basis for the opinion is offered, or the basis offered provides no support, the opinion is merely a conclusory statement and cannot be considered probative evidence, regardless of whether there is no objection. *Id.* "[A] claim will not stand or fall on the mere ipse dixit of a credentialed witness." *Id.* (quoting *Burrow v. Arce*, 997 S.W.2d 229, 235 (Tex. 1999)). Here, Milbourn's testimony and spreadsheet show that $856,941.36 was the amount the Kidwells *paid* on the loan principal, not the amount they borrowed. The title of the spreadsheet reflects that it is a summary of "payments." Milbourn testified that she categorized the payments by type and added all of them to arrive at subtotals for each category. She further testified that the "last total" on the spreadsheet reflects "the sum of all

---

[19] Appellants also argue the spreadsheet should have been excluded because it was based on documents not produced in discovery. At trial, appellants objected to the spreadsheet because neither it nor the underlying data it was based on were produced in discovery. The Kidwells responded that the objection was untimely and there was no surprise because the spreadsheet was produced in December 2017 and the underlying data was produced on a "flash drive." The trial court overruled the objection. Because we conclude Milbourn's opinion is conclusory, we do not reach whether the trial court erred in overruling appellants' objection on procedural grounds.

these categories of payments that were made to Mr. Bresnahan or his entities by the Kidwell entities." The subtotals for each category, including "loan principal," sum to the total amount in the spreadsheet, just as Milbourn testified.[20] It would have made no sense for Milbourn to include the amount borrowed in the sum of the total amount paid. To the extent Milbourn's statement—that $856,941.36 reflects "the total of all of the amounts that had been recorded in QuickBooks as loan principal"— can be construed as an opinion that the Kidwells borrowed only that amount, it conflicts with the rest of Milbourn's testimony and the spreadsheet itself. That is, the basis offered (the spreadsheet) provides no support for the opinion (that the Kidwells borrowed only $856,941.36 against the notes). *See id.* at 818–19 (expert opinion that had no basis in the record and contradicted the expert's own data was legally insufficient to support judgment). We therefore reject the Kidwells' argument, premised on this characterization of Milbourn's testimony, that the jury could reasonably have calculated the total amount due at foreclosure to be $1,139,635.

The evidence establishing the amount of the loan was thus limited to the loan documents, the draw receipts (Exhibit 7), Bresnahan's summary (Exhibit 88), and

---

[20] The categories and subtotal amounts were: "Loan Principal" - $856,941.36, "Interest" - $438,091.40, "Reg Fee [Interest Expense]" - $13,710.19, "Reg Fee [Professional Fees]" - $2,576.11, "Mgmt Fees" - $9,227.75, "Acct/CFO" - $34,100, "Reimbursement [Supplies]" - $566.65, and "Reimbursement [Withdrawal]" - $941.40. The sum of these numbers, listed in the spreadsheet as the total, is $1,356,154.86.

testimony from Bresnahan and Brad. Exhibit 88 reflects that the loan principal on the forty-seven draw receipts was $2,248,170 and the principal on the "other deficient notes" was $197,000. Bresnahan testified that the amount was "two and a half million," and Brad testified that the amount was $2.6 million or "somewhere in there." Although there were inconsistencies, the evidence conclusively established that KFLP borrowed at least $2 million in principal.

We now turn to the issue of payments KFLP made on the principal. Brad testified he believed he made a $20,000 payment before receiving Haddington's first notice of default in August 2015, while Milbourn's testimony and spreadsheet show over $850,000 in principal payments. Appellants argue that Milbourn's spreadsheet is inconclusive because she could not say whether those payments were made on the notes or other loans between the parties. Appellants also argue we cannot consider any evidence of payments, other than payments credited by Haddington, because the Kidwells failed to plead payment in accordance with Rule 95.

We agree that Rule 95 prohibited the Kidwells from introducing any evidence of payments not admitted by appellants. Payment is an affirmative defense which the defendant has the burden to plead and prove. *See* TEX. R. CIV. P. 94; *Rea v. Sunbelt Sav., FSB, Dallas, Tex.*, 822 S.W.2d 370, 372 (Tex. App.—Dallas 1991, no writ). Payments pled by the defendant which are not admitted in the plaintiff's petition must be specifically alleged. *See Rea*, 822 S.W.2d at 372 (citing TEX. R.

CIV. P. 95). Absence of a proper plea of payment renders evidence as to payment inadmissible. *Id.* The Kidwells pled payment in their answer but did not describe their payments with particularity or file an account stating the nature of any payments. They argue, however, that appellants waived reliance on Rule 95 because they did not specially except to the Kidwells' answer. We disagree. The provisions of rule 95 are mandatory, and a party is not required to specially except or to otherwise object to a defective plea in order to raise noncompliance with rule 95 on appeal. *Id.* at 373.

The Kidwells also argue that the issue of payment was tried by consent. *See* TEX. R. CIV. P. 67; *Equitable Tr. Co. v. Roland*, 644 S.W.2d 46, 53 (Tex. App.—San Antonio 1982, no writ) (affirmative defense of payment can be tried by consent). We disagree. Trial by consent can cure lack of pleading, but an issue is not tried by consent merely because evidence regarding it is admitted. *Bos v. Smith*, 556 S.W.3d 293, 307 (Tex. 2018). "The doctrine of trial by consent does not apply when the evidence of an unpleaded matter is relevant to the pleaded issues because it would not be calculated to elicit an objection." *Id.* Here, Milbourn's testimony was relevant to the Kidwells' claim for breach of fiduciary duty. The Kidwells pled that Bresnahan breached his fiduciary duty by failing to disclose his conflicts of interest and by unilaterally increasing his own wages. Milbourn testified that Bresnahan had a conflict of interest in representing the Kidwells as their personal financial advisor,

the Flour Mill as the borrower on the notes, and Haddington as the lender. She further testified that Bresnahan failed to comply with accepted accounting principles and failed to include any internal controls to ensure transactions were recorded properly. The spreadsheet, which she testified was based on QuickBooks records maintained by Bresnahan, supported her conclusion regarding Bresnahan's poor accounting practices. The spreadsheet also contained management fees Bresnahan paid himself from the Flour Mill account, which supported the allegation that Bresnanah unilaterally increased his own wages. Because the Kidwells' evidence of payment was also relevant to their pleaded claim for breach of fiduciary duty, we conclude payment was not tried by consent. *See Bos*, 556 S.W.3d at 307.

In sum, the Kidwells were not entitled to submit evidence on their affirmative defense of payment because they failed to comply with Rule 95 and the issue was not tried by consent. For the purposes of this legal sufficiency challenge, we are "barred by rules of law or of evidence from giving weight" to the Kidwells' evidence of payment. *See Gunn*, 554 S.W.3d at 658. Accordingly, we can only consider payment evidence "admitted" by appellants. *See* TEX. R. CIV. P. 95; *Rea*, 822 S.W.2d at 372.

The Kidwells argue appellants' own Exhibit 88 reflects $2,484,231 in payments. They derive this amount by adding the amounts under a column titled "Total Payments." Appellants argue that column reflects payments *due*, not

payments *made*. We agree with appellants. As stated, the first section of Exhibit 88 shows the draw date for forty-seven individual draws. Each of the forty-seven line items reflects the original draw date, due date, loan amount, interest rate, interest amount, regulatory fee, total payments, late fee, and accrued interest to June 7, 2016. Bresnahan testified that he prepared Exhibit 88 to reflect the "balance of the loan" and calculated interest at ten percent to arrive at the amount due. The column for "Total Payments" is the sum of the principal for each draw, plus ten percent of that principal in "Interest Due," plus one-half percent in regulatory fees for each draw. No reasonable jury could conclude that the "Total Payments" column of Exhibit 88 reflects amounts KFLP paid on the notes, especially in light of Brad's testimony that he "maybe" made only a $20,000 payment before August 2015 and had not made another payment after that date.

On this record, we conclude that the evidence was legally insufficient to support the jury's finding that the amount due immediately before foreclosure, taking interest and foreclosure costs into account, was $1,139,473. We now turn to the second step of the analysis: whether, in light of the entire record, appellants conclusively established the "contrary proposition." *See Dow Chem. Co.*, 46 S.W.3d at 241. This analysis often involves binary questions—the jury answered "no," so the appellant must conclusively establish the answer should have been "yes." *See, e.g.*, *Roytberg v. Wal-Mart Stores, Inc.*, 111 S.W.3d 843, 845 (Tex. App.—Dallas

2003, no pet.) (negligence question with "yes" or "no" answers). Where, as here, the answer is an amount, the contrary proposition is the amount the appellant alleges the jury should have found. *See PlainsCapital Bank*, 459 S.W.3d at 557; *see also Roytberg,* 111 S.W.3d at 845 (second step requires appellant to conclusively establish the "desired finding").

Appellants argue the amount due at foreclosure was $2,919,133, as that was the undisputed amount Bresnahan calculated in Exhibit 88. The Kidwells argue that there were conflicts regarding Exhibit 88 because, as Milbourn testified, Bresnahan often "incorrectly entered" loan amounts. We agree with the Kidwells. In a legal sufficiency analysis, we cannot ignore conflicts in the evidence, even where the conflict is within a party's own exhibits. *See City of Keller*, 168 S.W.3d at 820–21 ("[C]ourts reviewing all the evidence in a light favorable to the verdict must assume that jurors resolved all conflicts in accordance with that verdict."); *id.* at 827 ("Nor can evidence supporting a verdict be identified by which party offered it."). When there is conflicting evidence on a vital fact issue, we cannot conclude the party with the burden of proof established the fact as a matter of law. *See, e.g.*, *Scott v. Citizen's Nat. Bank*, No. 10-03-00322-CV, 2006 WL 3233878, at *5 (Tex. App.—Waco Nov. 8, 2006, no pet.) (party with burden of proof failed to conclusively prove bank transaction was a payment on a note where evidence conflicted regarding who authorized the transaction and timing of instructions to reverse it).

Here, there is a conflict between Exhibit 88 and Exhibit 7, the draw receipts. During closing argument, appellants argued: "Every time money was drawn [Bresnahan] got Mr. Kidwell to sign another little receipt-type note. So if you look at Exhibit 7, I think there's 43 of them. So ever[y] draw he got him to sign." The problem is that there are forty-seven such draws listed in Exhibit 88 but only thirty-eight draw receipts in Exhibit 7.[21] The missing draw receipts, including interest and fees, and the "other deficient notes" together accounted for $569,344 on Exhibit 88.[22] Moreover, Exhibit 88 charges a one-half percent regulatory fee for each draw. But, as Milbourn testified, the regulatory fee was authorized in "some" of the draw receipts. A review of the original loan documents and draw receipts shows that the regulatory fee was authorized on at most fifteen of the draws.[23] Given these conflicts,

---

[21] The draw receipts in Exhibit 7 are individually identified by exhibit numbers from A-1 to A-43. The fact that the last one was labeled A-43 explains counsel's statement that "there's 43 of them." However, Exhibit 7 does not include A-22, A-23, A-32, A-33, and A-34. Additionally, the clerk's record shows that appellants did attach forty-seven draw receipts to their second amended petition, their live pleading before trial. But Exhibit 7 also does not include draw receipts A-44 through A-47.

[22] We arrive at this number by adding $372,334 and $197,000. The former number represents the nine draws that were evidenced by draw receipts but somehow did not make it into Exhibit 7. The principal on those nine draws was $301,541, the remainder comprising interest and fees. The latter number represents the eight draws listed on Exhibit 88 as "Other deficient notes due at foreclosure." For these draws, Exhibit 88 includes only the principal loan amount, totaling $197,000. We assume the jury disregarded these amounts as well.

[23] The original loan documents do not authorize a regulatory fee. However, as Milbourn testified, KFLP agreed to pay regulatory fees by signing the draw receipts. Only ten of the draw receipts authorized Haddington to charge a regulatory fee while another five draw receipts authorized Haddington to charge a one-half percent "audit fee." Assuming that the audit fees were themselves regulatory fees, only fifteen of the forty-seven draws listed on Exhibit 88 authorized regulatory fees. Moreover, many of the draw receipts show the regulatory fee was charged at the time of the transaction. For example, the draw receipt dated August 13, 2014 stated that $100,000 was being drawn on the line of credit, but only $99,500 was advanced to KFLP, because the regulatory fee was deducted from the principal. Nevertheless, the entry for that draw

we cannot conclude that appellants established, as a matter of law, that the amount due on the notes immediately before foreclosure was $2,919,133. Accordingly, we overrule appellants' legal sufficiency challenge.

### C. Factual Sufficiency

When a party attacks the factual sufficiency of an adverse finding on an issue on which it has the burden of proof, it must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence. *Dow Chem. Co.*, 46 S.W.3d at 242. We must consider and weigh all of the evidence, and can set aside a verdict only if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Id*. In doing so, we must "detail the evidence relevant to the issue" and "state in what regard the contrary evidence greatly outweighs the evidence in support of the verdict." *Id.* (quoting *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986)).

Here, appellants urged the jury to answer Question 1 in the amount of $2,919,313, but the jury answered $1,139,473. We have already set forth the evidence that supports appellants' position and the evidence the jury could have

---

on Exhibit 88 shows that the $500 regulatory fee was being charged again. We note that many of the draw receipts authorize a regulatory fee to be charged annually, but even that is not consistent. For example, draw receipt A-18 authorizes a one-time regulatory fee of one-percent, which was deducted from the amount disbursed. Exhibit 88 does not account for the regulatory fee already paid for that draw and instead charges an additional one-half percent regulatory fee.

disregarded to bring the total closer to its finding.[24] Bresnahan testified that Haddington loaned KFLP roughly $2.5 million and Brad confirmed that the loan amount was "somewhere in there." The documentary evidence shows that KFLP borrowed $2,445,170, exclusive of interest and fees.[25] Even if the jury disregarded the nine "missing" draw receipts (totaling $301,541 in principal) and the eight "other deficient notes" (totaling $197,000), the principal loan balance would still be $1,946,629 at closing. The record also shows that, although Haddington was entitled to charge higher interest, at trial it discounted all interest rates to ten percent and for only one year on each draw. Thus, assuming the lower principal balance of $1,946,229, Haddington was entitled to at least $194,663 in interest, for a total due at foreclosure of $2,141,292, exclusive of fees.[26] That is nearly double what the jury found. Applying the foreclosure proceeds of $2 million against that amount, Haddington would have been entitled to a deficiency judgment of at least $141,292.

---

[24] For the same reasons described above, we cannot consider the Kidwells' payment evidence for this analysis. *See Vasquez v. J.S. Davis Ltd. Family P'ship*, No. 03-07-00478-CV, 2008 WL 2065946, at \*3 (Tex. App.—Austin May 16, 2008, no pet.) (declining to consider payment evidence in factual sufficiency analysis where borrower failed to plead payment).

[25] We arrive at this number by adding the total "loan amount" ($2,248,170) and "other deficient notes" ($197,000) on Exhibit 88.

[26] Although the loan documents authorized late fees on every draw and some of the draw receipts authorized regulatory fees, Question 1 instructed the jury to consider "the unpaid balance" including "unpaid interest accrued" and "reasonable fees and expenses (other than attorney's fees) related to enforcing the Note and/or Deed of Trust." A reasonable jury might therefore conclude that it was being instructed to ignore the late fees and regulatory fees, as those fees were not related to the foreclosure. For the purpose of this analysis, therefore, we will ignore the regulatory and late fees.

On this record, we conclude the jury's finding was against the great weight and preponderance of the evidence. Additionally, because the finding effectively swung the judgment from a deficiency in Haddington's favor to a surplus in KFLP's favor, we conclude the finding was manifestly unjust. Accordingly, we reverse the trial court's surplus judgment and remand this case to the trial court for a new trial, as outlined below.[27]

## CONCLUSION

We reverse the trial court's judgment awarding Mary Kidwell damages and interest on her claim for violations of the Deceptive Trade Practices Act. We also reverse the trial court's judgment awarding Mary Kidwell attorneys' fees on that claim. We remand this case to the trial court with instructions to refer all of Mary Kidwell's claims, including any claim for attorneys' fees, to arbitration in accordance with the subscription agreement. We also reverse the trial court's judgment awarding KFLP $860,527 in surplusage from the foreclosure and interest thereon.[28] We remand this case to the trial court for a new trial to determine the

---

[27] Because of our disposition of appellants' first issue on sufficiency grounds, we do not reach appellants' argument that the trial court abused its discretion in granting the Kidwells leave to file their seventh amended counterclaim. We also do not reach appellants' argument that the trial court abused its discretion in refusing to admit records from KFLP's bankruptcy into evidence.

[28] We necessarily strike the trial court's conclusion, in the second paragraph of the judgment, that the jury returned its verdict in favor of the Kidwells.

outstanding balance on the notes immediately before foreclosure and enter judgment

accordingly.[29] In all other respects, we affirm the trial court's judgment.


/Bonnie Lee Goldstein/
BONNIE LEE GOLDSTEIN
JUSTICE


191202F.P05

---

[29] On remand, the trial court may, in its discretion, allow the parties to amend their pleadings to the extent needed to retry the issues encompassed by Question 1, including the amount loaned, interest accrued, principal and interest payments, and any charges authorized by the loan documents. The trial court shall then calculate the amount of deficiency or surplus in accordance with section 51.003 of the Property Code.



# Court of Appeals
## Fifth District of Texas at Dallas
## JUDGMENT

HADDINGTON FUND, LP AND JB
WEALTH MANAGEMENT, LLC,
Appellants

No. 05-19-01202-CV          V.

BRADLEY S. KIDWELL,
BRADLEY S. KIDWELL FAMILY
LIMITED PARTNERSHIP, MARY
COE KIDWELL, Appellees

On Appeal from the 429th Judicial
District Court, Collin County, Texas
Trial Court Cause No. 429-02197-2016.
Opinion delivered by Justice
Goldstein. Justices Molberg and
Smith participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED** in part and **REVERSED** in part.

We **REVERSE** that portion of the trial court's judgment awarding MARY COE KIDWELL damages, attorneys' fees, and interest on her claim for violations of the Texas Deceptive Trade Practices Act and **REMAND** this cause to the trial court with instructions to refer all of MARY COE KIDWELL's claims against appellants to arbitration.

We **REVERSE** that portion of the trial court's judgment awarding the BRADLEY S. KIDWELL FAMILY LIMITED PARTNERSHIP surplus proceeds from the June 7, 2016 foreclosure sale, and interest thereon, and **REMAND** this cause to the trial court for a new trial in accordance with the Court's opinion of this day.

In all other respects, the trial court's judgment is **AFFIRMED**.

It is **ORDERED** that appellants HADDINGTON FUND, LP and JB WEALTH MANAGEMENT, LLC recover their costs of this appeal from appellees BRADLEY S. KIDWELL, BRADLEY S. KIDWELL FAMILY LIMITED PARTNERSHIP, and MARY COE KIDWELL.

Judgment entered this 11th day of January, 2022.